Exhibit 2

ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE PRIMERA INSTANCIA
SALA SUPERIOR DE BAYAMÓN

| | |
|---|---|
| LUIS ARENAS, ALEJANDRO D. CERDA, IVELISSE BORRERO DE CORDOVÉS, ARTURO FERNÁNDEZ, FELIPE FLORES ROLÓN, FRANCISCO GERARDO LARREA FRENCH, MARÍA LARREA DE MAJANO, GILBERTO MARXUACH, JACOBO ORTIZ MURIAS, ANICETO SOLARES RIVERO y FERNANDO L. TORO, <br><br> Demandantes, <br><br> v. <br><br> JOHN MATTHEW COOK, ELLYSMAR GÓMEZ LUZARDO, GERARDO LARREA OLOZAGA, JUAN ANTONIO LARREA FRENCH, CARIBBEAN GLAZE CORPORATION y GLAZE ON INVESTMENT INC., <br><br> Demandados. | CIVIL NÚM. DAC 14-1549 <br> Sala 504 <br><br> SOBRE: <br><br> SENTENCIA DECLARATORIA, INCUMPLIMIENTO DE CONTRATO, *PROMISSORY ESTOPPEL* |



## DEMANDA

**AL HONORABLE TRIBUNAL:**

**COMPARECEN** Luis Arenas, Alejandro D. Cerda, Ivelisse Borrero De Cordovés, Arturo Fernández, Felipe Flores Rolón, Francisco Gerardo Larrea French, María Larrea De Majano, Gilberto Marxuach, Jacobo Ortiz Murias, Aniceto Solares Rivero y Fernando L. Toro (en conjunto los "Accionistas Minoritarios"), por conducto de la representación legal que suscribe, y muy respetuosamente exponen, alegan y solicitan:

### I. Partes y Competencia

#### A. Demandantes

1. El señor Luis Arenas ("Arenas") es accionista minoritario con un 2% de participación en Glaze On Investments, Inc. ("Glaze On") y Caribbean Glaze Corporation ("Caribbean Glaze")(en conjunto, las "Corporaciones"), con dirección en 425 Carr. 693, UPS #317, Dorado, Puerto Rico 00646.

2. El señor Alejandro D. Cerda ("Cerda") es accionista minoritario con un 1% de participación en las Corporaciones, con dirección en 1158 Ave. Magdalena #6, San Juan, Puerto Rico 00907.

3. La señora Ivelisse Borrero De Cordovés ("Borrero") es accionista minoritaria con un 1% de participación en las Corporaciones, con dirección en Urb. Bosque Dorado, 60027 Calle Tulipán, Dorado, Puerto Rico 00646.

4. El señor Arturo Fernández ("Fernández") es accionista minoritario con un 2% de participación en las Corporaciones, con dirección en Hacienda San José, Cautiva 972, Caguas, Puerto Rico 00727.

5. El señor Felipe Flores Rolón ("Flores") es accionista minoritario con un 1% de participación en las Corporaciones, con dirección en #33 Camino Tórtolas, Sabanera Dorado, Dorado, Puerto Rico 00646.

6. El señor Francisco Gerardo Larrea French ("Francisco G. Larrea French") es accionista minoritario con un 0.5% de participación en las Corporaciones, con dirección en 5272 N.W. 112CT, Miami, Florida 33178.

7. La señora María Larrea De Majano ("María Larrea") es accionista minoritaria con un 0.5% de participación en las Corporaciones, con dirección en 4711 University Drive, Coral Gables, Florida 33146.

8. El señor Gilberto Marxuach ("Marxuach") es accionista minoritario con un 2% de participación en las Corporaciones, con dirección en V4 Calle Corta, Guaynabo, Puerto Rico 00966.

9. El señor Jacobo Ortiz Murias ("Ortiz") es accionista minoritario con un 2% de participación en las Corporaciones, con dirección en Edif. Colgate Palmolive, Suite 308, Metro Office Park, Calle 1, Guaynabo, Puerto Rico 00968-1705.

10. El señor Aniceto Solares Rivero ("Solares") es accionista minoritario con un 2% de participación en las Corporaciones, con dirección en PO Box 366999, San Juan, Puerto Rico 00936-6999.

11. El señor Fernando L. Toro ("Toro") es accionista minoritario con un 2% de participación en las Corporaciones, con dirección en PO Box 360831, San Juan, Puerto Rico 00936-0831.

**B. Demandados**

12. El señor John Cook ("Cook") es miembro de la Junta de Directores de Caribbean Glaze, Presidente y *Chief Executive Officer* de dicha corporación, y posee un 21% de participación en las Corporaciones, y residente de San Juan, Puerto Rico.

13. La señora Ellysmar Gómez ("Gómez") es miembro de la Junta de Directores de Caribbean Glaze, Tesorera de dicha corporación, y posee un 21% de participación en las Corporaciones, y residente de San Juan, Puerto Rico.

14. El señor Gerardo Larrea Olozaga ("Larrea Olozaga") es miembro de la Junta de Directores de Caribbean Glaze y posee un 21% de participación en las Corporaciones, y residente de Guaynabo, Puerto Rico.

15. El señor Juan Antonio Larrea French ("Larrea French") es miembro de la Junta de Directores de Caribbean Glaze y posee un 21% de participación en las Corporaciones, y es residente de San Juan, Puerto Rico.

16. Glaze On es una corporación organizada bajo las leyes del Estado Libre Asociado de Puerto Rico, con oficinas principales en Royal Industrial Park, Edificio J2, Carretera 869, Bo. Palmas, Cataño, Puerto Rico 00962. Glaze On es la corporación tenedora del 100% de las acciones de Caribbean Glaze.

17. Caribbean Glaze es una corporación organizada bajo las leyes del Estado Libre Asociado de Puerto Rico, con oficinas principales en Royal Industrial Park, Edificio J2, Carretera 869, Bo. Palmas, Cataño, Puerto Rico 00962. Caribbean Glaze opera la franquicia Krispy Kreme en Puerto Rico.

### C. Competencia

18. La presente acción ha sido presentada en el Tribunal de Primera Instancia de la Región Judicial de Bayamón, conforme a la Regla 3.5 de Procedimiento Civil, que dispone que el pleito deberá presentarse en la sala en que tengan establecidas sus residencias las partes demandadas o alguna de ellas.[1]

### II. Relación de Hechos Pertinentes

19. En el año 2002, Larrea French, Larrea Olozaga (en conjunto, los "Larrea"), Cook y Gómez comenzaron las gestiones para desarrollar Krispy Kreme en Puerto Rico. Luego de varias comunicaciones y reuniones, el 31 de julio y el 7 de agosto de 2003, el representante de Krispy Kreme Doughnuts Corporation ("KKDC") y Larrea French, como Presidente de South American Restaurant Corp. ("SARCO"),[2] suscribieron una carta de intención.

20. Conforme a la carta de intención, Larrea French y KKDC acordaron incorporar a Caribbean Glaze bajo las leyes de Puerto Rico. Dicha corporación estaría a cargo de la administración de Krispy Kreme en la Isla. El Grupo Larrea, o una de sus

---

[1] Ambas corporaciones tienen sus oficinas principales en el pueblo de Cataño y el demandado Larrea Olozaga reside en el pueblo de Guaynabo. Ambos pueblos pertenecen a la Región Judicial de Bayamón.
[2] Larrea French es el Chief Executive Officer de varias corporaciones que componen el Grupo Larrea, entre las cuales se encuentra SARCO. El Grupo Larrea se compone de las siguientes corporaciones: IRSI (corporación que opera Chili's, Romano's Macaroni Grill, On The Border y P.F. Chang's); SARCO (corporación que opera Church's Chicken); P.T. Inc. (corporación que opera Pollo Tropical); Caribbean Glaze (corporación que opera Krispy Kreme); y South American Capital Corp. (corporación de bienes raíces).

3

afiliadas, tendría el 70% de las acciones de Caribbean Glaze y Krispy Kreme International Ltd., o una de sus afiliadas, tendría el restante 30% de las acciones. A esos efectos, en el 2003, el co-demandante Marxuach incorporó a Caribbean Glaze.

21. En el 2004, los Larrea, Cook, Gómez y KKDC firmaron una serie de acuerdos y documentos corporativos, entre ellos, el acuerdo de accionistas de Caribbean Glaze y el modelo de empresa conjunta para la operación de Krispy Kreme en Puerto Rico. Durante este tiempo, los Larrea, Cook y Gómez acordaron incorporar a Glaze On, una corporación que tendría inicialmente un 70% de las acciones de Caribbean Glaze y luego se convertiría en la tenedora del 100% de las acciones. El co-demandante Ortiz fue el encargado de incorporar a Glaze On.

22. Desde la creación de las Corporaciones, los accionistas mayoritarios habían manifestado su interés y deseo de conceder una participación minoritaria a diversas personas que podían ser de utilidad para las Corporaciones y aportar a su éxito, ya fuera por su conocimiento o trasfondo profesional o su relación con el Grupo Larrea. Lo anterior respondió a la política del Grupo Larrea de ofrecerle a sus directores y ejecutivos la oportunidad de participar en las franquicias y cadenas de restaurantes que se adquirieran a través de las distintas corporaciones. Actualmente, muchos de los Accionistas Minoritarios tienen participación en los restaurantes Church's Chicken, Pollo Tropical, Burger King, Chili's, Romanos Macaroni Grill, On The Border y P.F. Chang's. La intención de los Larrea, Cook y Gómez era continuar con esta cultura empresarial a través de las Corporaciones.

23. Entre el 2003 y 2004, los accionistas mayoritarios comenzaron a discutir la composición e identidad de los accionistas de las Corporaciones. Es durante dicho proceso que se discutió la posible participación de los co-demandantes Arenas, Fernández, Francisco G. Larrea French, Marxuach, Ortiz y Toro como accionistas minoritarios en las Corporaciones.

24. Debido a problemas de Krispy Kreme a nivel internacional, las partes renegociaron los términos de la empresa conjunta y el acuerdo de franquicia. Finalmente, en el 2006, se disolvió la empresa conjunta, retirándose KKDC como accionista de Caribbean Glaze y sobreviviendo solamente Glaze On con el 100% de las acciones de Caribbean Glaze. Lo anterior causó también que se cancelara el acuerdo de accionistas de Caribbean Glaze.

25. Es durante el 2008 que los accionistas mayoritarios retoma el tema de la composición de los accionistas de las Corporaciones. Por medio de conversaciones

telefónicas y reuniones, en las que algunas participaron Larrea French y Cook y en otras sólo Larrea French, se les hizo una oferta a los co-demandantes Fernández, Francisco G. Larrea French, Marxuach, Ortiz y Toro para que fueran accionistas minoritarios de las Corporaciones, sin derecho a voto. En dichas conversaciones se les indicó su por ciento de participación y la aportación de capital que se les requeriría a cada uno. Todos aceptaron la oferta.

26. Larrea French, en algunas ocasiones con Cook, también le ofreció una participación como accionistas minoritarios a los co-demandantes Arenas, Cerda, Borrero, Flores, María Larrea y Solares, indicándoles su por ciento de participación y correspondiente contribución. Finalmente, todos aceptaron ser accionistas minoritarios de las Corporaciones.

27. Larrea French les informó a los Accionistas Minoritarios que los accionistas mayoritarios les notificarían cuándo tendrían que hacer la aportación de capital correspondiente a su por ciento de participación en las Corporaciones, según acordado, ya que antes había que finalizar la estructura corporativa de Caribbean Glaze y Glaze On ante la salida de KKDC como accionista, incluyendo la preparación del acuerdo de accionistas. Una vez se culminara con dicho proceso, se recibirían las aportaciones de los Accionistas Minoritarios y se emitirían los correspondientes certificados de acciones.

28. Como resultado de las conversaciones con los demandantes, para abril del 2008, los accionistas mayoritarios habían confirmado y aceptado la lista final de los accionistas de las Corporaciones. Véase **Anejo 1.**

29. Luego de que los accionistas mayoritarios y KKDC suscribieran varios "addendums" al acuerdo de franquicia, en mayo de 2008, se abrió la primera tienda Krispy Kreme en Caguas.

30. Entre el 2009 y 2012, Larrea French continuó dándole seguimiento a los Accionistas Minoritarios e informándoles que aún los accionistas mayoritarios estaban en proceso de preparar y aprobar varios documentos corporativos, entre los cuales estaban adoptar los "by-laws" de las corporaciones, fusionar a Caribbean Glaze y Glaze On, emitir las acciones Clase A (i.e. los Larrea, Cook y Gómez) y Clase B (i.e. los Accionistas Minoritarios) en Caribbean Glaze y suscribir los acuerdos de accionistas para la Clase A (accionistas con derecho a voto) y Clase B (accionistas sin derecho a voto).

31. Durante este periodo, a los Accionistas Minoritarios siempre se les dio a entender, y así lo entendieron, que eran parte del grupo de accionistas de las

5

corporaciones, por lo que celebraban junto con los accionistas mayoritarios el éxito de Krispy Kreme en Puerto Rico.

32. Entre el 2010 y 2012, surgieron diferentes desavenencias entre los Larrea, Cook y Gómez que obstaculizó la suscripción de los diversos documentos corporativos por lo que el proceso de finalizar la estructura corporativa de Caribbean Glaze y Glaze On nunca ocurrió.

33. Lo anterior no afectó el desarrollo de Krispy Kreme en Puerto Rico. Para el año 2013, Caribbean Glaze había abierto cuatro tiendas adicionales de Krispy Kreme en los pueblos de Guaynabo, Dorado, Ponce y Mayagüez. Durante este periodo los Accionistas Minoritarios estaban en espera de recibir las instrucciones correspondientes para finalizar su participación en las Corporaciones.

34. Al igual que los accionistas mayoritarios de las Corporaciones, los Accionistas Minoritarios también contribuyeron significativamente al desarrollo de Krispy Kreme en Puerto Rico, según se expone a continuación.

35. Los co-demandantes Marxuach y Ortiz brindaron su asesoría legal a los accionistas mayoritarios y a las Corporaciones, además de incorporar a Caribbean Glaze y Glaze On, según expuesto anteriormente. Marxuach, además, fungió como secretario de la Junta de Directores de Caribbean Glaze desde el 2003 al 2008.

36. El co-demandante Toro asistió a Caribbean Glaze en la planificación y estrategia de penetración del mercado de las tiendas Krispy Kreme, ofreciendo la ubicación de las primeras tiendas Krispy Kreme en Caguas y Ponce. Subsiguientemente, Toro ofreció consultoría a Caribbean Glaze en relación a otros lugares alrededor de la Isla para la apertura de otras tiendas, como fue el caso de Guaynabo y Dorado.

37. Varios co-demandantes proveyeron su tiempo y servicios previo y durante las aperturas de Krispy Kreme en Caguas y Guaynabo, incluyendo la aportación de empleados de otras cadenas de restaurantes del Grupo Larrea que estaban a su cargo. Tal fue el caso de Flores, Francisco G. Larrea French, Borrero y Fernández. Como VP de Mercadeo de Church's Chicken y con más de 17 años trabajando con el Grupo Larrea, Flores estuvo encargado del área de mercadeo y relaciones públicas de Krispy Kreme. De igual forma, Francisco G. Larrea French con sus 20 años de experiencia con el Grupo Larrea asistió a Flores en el área de mercadeo, incluyendo la revisión de artes gráficas y comerciales.

38. Por su parte, Borrero, como Vice-Presidenta de Recursos Humanos de SARCO por más de 10 años, brindó apoyó a Caribbean Glaze en la fase de contratación de empleados para las aperturas de Krispy Kreme en Caguas y Guaynabo. Borrero trabajó con Krispy Kreme desde el 2006, brindando su apoyo en las áreas de reclutamiento, entrenamiento y establecimiento de procedimientos y normas.

39. De igual forma, Fernández asistió a Borrero en la selección y reclutamiento de personal. Dado sus 33 años con el Grupo Larrea y su posición como VP de Operaciones a cargo de más de 116 restaurantes de Church's Chicken en Puerto Rico, Fernández aportó su conocimiento y experiencia en la apertura de Krispy Kreme.

40. Otras personas que contribuyeron a que los Larrea, Cook y Gómez obtuvieran la franquicia de Krispy Kreme debido a su conocimiento y más de 30 años de experiencia en el mercado de restaurantes fueron los co-demandantes Solares y Arenas, ambos como principales ejecutivos de los restaurantes Burger King en Puerto Rico.

41. No obstante lo anterior, el 13 de febrero de 2013, Larrea French les envió una carta a los Accionistas Minoritarios informándoles que Cook y Gómez no querían reconocer a los Accionistas Minoritarios como accionistas de las Corporaciones, a pesar de que se habían obligado a hacerlo al ofrecerle a los Accionistas Minoritarios una participación en las mismas. Véase **Anejo 2.** De igual forma, Larrea French les informó del impasse existente entre los accionistas mayoritarios sobre la declaración y distribución de dividendos.

42. Es durante este tiempo, a principios del 2013, que Cook y Gómez por primera vez se negaron a reconocer a los demandantes como accionistas minoritarios de las Corporaciones.

43. En respuesta, los Accionistas Minoritarios le enviaron varias cartas a Larrea French expresando su sorpresa e indignación ante la posición asumida por Cook y Gómez. Véase **Anejo 3.** A su vez, exigieron que las Corporaciones cumplieran con su promesa de reconocerlos como accionistas minoritarios y con su obligación de emitir los certificados de acciones según se había acordado con los accionistas mayoritarios desde el 2008.

44. El 17 de septiembre de 2013, los Accionistas Minoritarios recibieron una carta de Larrea French mediante la cual les informó que tanto él como Larrea Olozaga continuaban requiriéndole a Cook y a Gómez que reconocieran los derechos de los Accionistas Minoritarios. Véase **Anejo 4.** Larrea French también les informó a los Accionistas Minoritarios que, ante la continua negativa de Cook y Gómez en reconocer la

obligación de las Corporaciones para los Accionistas Minoritarios, les envió una carta a Cook y a Gómez con fecha de 26 de agosto de 2013 expresando su desacuerdo con la posición asumida por ellos e informando lo siguiente:

> En cuanto a los Accionistas Minoritarios, por más que ustedes pretendan ahora apropiarse de la participación de ellos, **saben muy bien que los cuatro [Cook, Gómez, Larrea Olozaga y Larrea French] tenemos un compromiso con ellos que hay que cumplir**. Les repetimos que jamás apoyaremos esa pretensión de ustedes.

Carta con fecha de 17 de septiembre de 2013 (énfasis nuestro)(texto entre corchetes añadido).

45. En la referida carta, Larrea French les indicó a los Accionistas Minoritarios que tanto él como Larrea Olozaga les habían informado a Cook y a Gómez que estaban dispuestos a declarar un dividendo sujeto a que se depositara en una cuenta plica el 16% del monto del dividendo hasta que se resolviera la controversia con los Accionistas Minoritarios. Los Accionistas Minoritarios estaban en espera de ser informados de la respuesta de Cook y Gómez a dicha propuesta.

46. Durante el proceso de evaluar los próximos pasos a seguir y las acciones a tomar, los Accionistas Minoritarios fueron informados que el 31 de octubre de 2013, Cook y Gómez presentaron una Petición de *Mandamus* en el Caso Civil Núm. K PE2013-5152 (505), en la que le solicitaron al Tribunal que ordenara a los Larrea a declarar y distribuir dividendos de Caribbean Glaze con el objetivo de dar cumplimiento a la Sección 1102-2 del Código de Rentas Internas de Puerto Rico, 13 L.P.R.A. § 30075 ("Caso de *Mandamus*"). No obstante, en la Petición de *Mandamus*, Cook y Gómez omitieron incluir a los Accionistas Minoritarios como accionistas de las Corporaciones con derecho a recibir una potencial distribución de dividendos.

47. Como resultado de lo anterior, el 31 de diciembre de 2013, los Accionistas Minoritarios presentaron una solicitud de intervención y una demanda de sentencia declaratoria en el Caso de *Mandamus* para que se les reconociera como accionistas minoritarios de las Corporaciones. Luego de varios eventos procesales, el 22 de mayo de 2014, el Tribunal desestimó, sin perjuicio, la demanda de los Accionistas Minoritarios por falta de jurisdicción sobre Cook y Gómez.[3]

48. Según mencionado anteriormente, los Accionistas Minoritarios brindaron de su tiempo y esfuerzo para la obtención de la franquicia Krispy Kreme y su eventual

---

[3] El Tribunal incorrectamente determinó que los Accionistas Minoritarios tenían que emplazar a Cook y Gómez con la demanda de sentencia declaratoria cuando éstos ya eran partes en el caso por haberse sometido voluntariamente a la jurisdicción del Tribunal mediante la presentación de la Petición de *Mandamus*.

8

apertura en Puerto Rico sin recibir remuneración alguna de las Corporaciones. En agradecimiento a la aportación de cada uno de los Accionistas Minoritarios fue que los Larrea, Cook y Gómez les ofrecieron unirse al grupo de accionistas de las Corporaciones.

49. A esos efectos, los accionistas mayoritarios y las Corporaciones se obligaron a darle a los Accionistas Minoritarios una participación de entre un 0.5% y 2% en las Corporaciones, para un total de 16%. Dicha participación conllevaría una aportación de capital por cada accionista de entre $2,000.00 y $8,000.00. Los Accionistas Minoritarios aceptaron la oferta que se les hizo a nombre de las Corporaciones y sólo estaban en espera de que se les informara cuándo tendrían que hacer su aportación de capital.

50. No cabe duda de que la intención de los accionistas mayoritarios era que los demandantes fueran también accionistas de las Corporaciones y así lo demostraron al hacer una promesa vinculante. Una vez los Accionistas Minoritarios aceptaron la oferta, como en efecto lo hicieron, las Corporaciones no podían retirarla unilateralmente, como actualmente pretenden Cook y Gómez al negar la existencia de los demandantes como accionistas de las Corporaciones.

### III. Causas de Acción:

#### Primera Causa de Acción:
#### Sentencia Declaratoria Determinando que los Demandantes son Accionistas Minoritarios de las Corporaciones

51. Se incorporan por referencia las alegaciones hechas en los párrafos 1 al 50, previamente relacionados.

52. Los demandantes acuden ante este Tribunal para que declare que éstos son accionistas minoritarios de las Corporaciones conforme a la obligación contraída por los accionistas mayoritarios y las Corporaciones de reconocerlos como tal.

53. La Regla 59 de Procedimiento Civil de Puerto Rico establece el mecanismo de sentencia declaratoria al disponer que el "[t]ribunal de Primera Instancia tendrá autoridad para declarar derechos, estados y otras relaciones jurídicas aunque inste o pueda instarse otro remedio". 32 L.P.R.A. Ap. V, R. 59. La sentencia declaratoria se dicta cuando existe una controversia sustancial entre partes con intereses legales adversos para así disipar incertidumbres jurídicas. Municipio de Fajardo v. Secretario de Justicia, 2012 T.S.P.R. 170, 2012 WL 5991782, Op. de 8 de noviembre de 2012 en *3.

i. El carácter obligatorio de los contratos o promesas verbales entre las partes

9

54. Nuestro ordenamiento jurídico reconoce la validez de los contratos verbales ya que "los contratos son obligatorios independientemente de la forma en que se hayan celebrado, siempre que concurran los requisitos necesarios para su validez". 31 L.P.R.A. § 3451. El Artículo 1044 del Código Civil dispone que "las obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes y deben cumplirse a tenor de los mismos". 31 L.P.R.A. § 2994.

55. Los requisitos esenciales para la validez de un contrato son: "(1) consentimiento de los contratantes; (2) objeto cierto que sea materia del contrato; y (3) causa de la obligación que se establezca". 31 L.P.R.A. § 3391. Una vez las partes consienten a quedar vinculados mediante un contrato, están sujetos no sólo al cumplimiento de lo expresamente pactado, "sino también a todas las consecuencias que según su naturaleza sean conformes a la buena fe, al uso y a la ley". 31 L.P.R.A. § 3375.

56. No cabe duda que desde el comienzo, los accionistas mayoritarios acordaron la participación de los Accionistas Minoritarios y les comunicaron en diversas ocasiones dicha determinación. Incluso, así lo han sostenido los accionistas mayoritarios Larrea Olozaga y Larrea French. Dicha obligación contraída fue en agradecimiento a los Accionistas Minoritarios que, con su esfuerzo y trabajo, aportaron al éxito de Krispy Kreme, ya fuera por su conocimiento o trasfondo profesional o su relación con el Grupo Larrea.

57. Al ofrecerle a los Accionistas Minoritarios ser accionistas de las Corporaciones, los accionistas mayoritarios les indicaron a los Accionistas Minoritarios su por ciento de participación y la aportación de capital que se le requeriría a cada uno. Todos los Accionistas Minoritarios aceptaron. Ante dicha obligación contraída, Cook, Gómez y las Corporaciones no pueden negarles a los Accionistas Minoritarios su derecho de participación en las Corporaciones como accionistas.

ii. **La validez de los contratos de suscripción de acciones basado en la conducta entre las partes**

58. Las acciones de una corporación se adquieren mediante un contrato de suscripción. Véase Santiago Aponte v. Rodríguez Martínez, 181 D.P.R. 204, 216 (2011). "El contrato debe indicar, al menos de forma general, la naturaleza y el propósito principal de la corporación a crearse, el capital autorizado, el tipo y número de acciones autorizadas, y la clase, el valor y la cantidad de acciones relacionadas a la suscripción". Id. Conforme al Artículo 5.17 de la Ley General de Corporaciones, Ley Núm. 164 de 16 de diciembre de 2009 ("Ley de Corporaciones"), el acuerdo de suscripción debe constar por escrito para

10

que pueda hacerse valer contra un suscriptor. Sin embargo, cuando el suscriptor quiera hacer cumplir su contrato frente a la corporación, la Ley no exige que el contrato sea por escrito. *Id.* a la pág. 222. A esos efectos el Tribunal Supremo determinó lo siguiente:

> Conforme sostiene la jurisprudencia, un contrato de suscripción de acciones es similar a cualquier otro contrato. **Si existe una causa válida, la conjunción de voluntades y un objeto lícito, el contrato queda perfeccionado. No es necesario que conste por escrito**, a menos que la carta constitutiva de la corporación, su reglamento o las leyes del estado así lo requieran.

Santiago Aponte v. Rodríguez Martínez, *supra*, pág. 216 (citando a *Progreso Financiero, Inc. v. Gómez*, 55 D.P.R. 850, 854 (1940) (énfasis nuestro).

59. El hecho de que no haya un contrato de suscripción de acciones por escrito entre las Corporaciones y los Accionistas Minoritarios, en nada afecta el derecho de los demandantes de exigir que las Corporaciones cumplan con su obligación de reconocerlos como accionistas y que se emitan los correspondientes certificados de acciones en cumplimiento con lo que se les prometió.

60. Conforme a Santiago Aponte, *supra*, se ha reconocido la validez de un contrato de suscripción de acciones basado, precisamente, en promesas verbales y en la conducta de las partes. En la medida que, desde antes del 2008, los accionistas mayoritarios acordaron la inclusión de los demandantes como accionistas de las Corporaciones y les comunicaron dicha intención, existe un acuerdo de suscripción de acciones que vincula a los accionistas mayoritarios y a las Corporaciones frente a los demandantes.

61. Como prueba de la obligación contraída, existen varios correos electrónicos en los cuales los accionistas mayoritarios discuten la identidad y composición final de los accionistas de las Corporaciones, e incluyen a los Accionistas Minoritarios con su por ciento de participación y la aportación de capital que se les requeriría a cada uno. Véase **Anejo 1**.

62. De igual forma, y según surgirá del testimonio de varios Accionistas Minoritarios, Cook personalmente, junto con Larrea French, les ofrecieron a varios Accionistas Minoritarios una participación como accionistas en las Corporaciones y recibieron de cada uno la correspondiente aceptación, configurándose en todos estos casos los elementos necesarios para el contrato de suscripción de acciones según lo establecido en Santiago Aponte, *supra*.

63. El Tribunal Supremo, además, ha determinado que un accionista no adquiere la plena titularidad de las acciones hasta que no pague por éstas. Al así hacerlo, el Tribunal dispuso lo siguiente:

11

> [L]os actos de la corporación y de los otros accionistas convirtieron al doctor Santiago Aponte en accionista. Corresponde ahora que [la corporación] tome las medidas para que se cumpla con el acuerdo que le daría plena titularidad sobre el 30% de las acciones. Es decir, procede que el doctor Santiago pague por los $25,000 de la distribución de dividendos, según acordaron las partes, para que adquiera la plena titularidad del 30% de las acciones.

Santiago Aponte v. Rodríguez Martínez, *supra,* pág. 224 (texto entre corchetes añadido).

64. A los Accionistas Minoritarios se le informó su por ciento de participación y la correspondiente aportación de capital requerida. En ningún momento los Accionistas Minoritarios se han negado a hacer su contribución. Todo lo contrario. Han estado en espera desde el 2008 para completar esta fase y recibir los certificados de acciones.

65. Sin embargo, ante la posición asumida por Cook y Gómez, como resultado de los desacuerdos con los otros accionistas mayoritarios de las Corporaciones, dicha gestión no ha sido posible. Las discrepancias entre los accionistas mayoritarios es la razón principal por la cual al día de hoy las Corporaciones no han emitido certificados de acciones a ninguno de sus accionistas, incluyendo a los accionistas mayoritarios. Incluso, ninguno de los accionistas mayoritarios tampoco ha suscrito un contrato de suscripción de acciones por escrito.

66. Ante las acciones de Cook, Gómez y de las Corporaciones en detrimento de los Accionistas Minoritarios, éstos le solicitan a este Honorable Tribunal que declare que son accionistas para así vindicar sus derechos frente a las Corporaciones y los accionistas mayoritarios, incluyendo el derecho de poder exigir que se emitan los correspondientes certificados de acciones.

### Segunda Causa de Acción:
### Incumplimiento con el Contrato de Suscripción de Acciones

67. Se incorporan por referencia las alegaciones hechas en los párrafos 1 al 66, previamente relacionados.

68. Conforme al Artículo 1044 del Código Civil las obligaciones que surgen de los contratos tienen fuerza de ley entre las partes contratantes y deben cumplirse según acordadas. 31 L.P.R.A. § 2994. A tales efectos, los tribunales de justicia no pueden relevar a una parte de cumplir con lo que se obligó a hacer mediante contrato. Ha sido norma reiterada que cuando un contrato es legal, válido y no contiene vicio alguno, el mismo constituye la ley entre las partes y debe cumplirse a tenor del mismo. *Constructora Bauza, Inc. v. García López,* 129 D.P.R. 579, 593 (1991).

69. Por otra parte, el Artículo 1077 del Código Civil dispone que cuando una de las partes contratantes incumple con sus obligaciones bajo el contrato, la parte perjudicada

puede exigir el cumplimiento específico de la obligación, con el resarcimiento de daños. 31 L.P.R.A. § 3052.

70. Según discutido anteriormente, las promesas verbales y la conducta de los accionistas mayoritarios constituyeron un contrato de suscripción por lo que los Accionistas Minoritarios tienen el derecho a exigir que las Corporaciones cumplan con su obligación de reconocerlos como accionistas y que se emitan los correspondientes certificados de acciones.

71. De lo contario, los accionistas mayoritarios y las Corporaciones tendrían la obligación de resarcir a los Accionistas Minoritarios por los daños y perjuicios causados, siendo dichos daños en una cantidad no menor del valor de sus acciones, incluyendo las cantidades que les corresponderían a los Accionistas Minoritarios en cualquier distribución de dividendos de las Corporaciones.

### Tercera Causa de Acción:
### Declaración Unilateral de Voluntad o *Promissory Estoppel*

72. Se incorporan por referencia las alegaciones hechas en los párrafos 1 al 71, previamente relacionados.

73. En nuestro ordenamiento jurídico, la declaración unilateral de voluntad es reconocida como una de las fuentes de obligaciones de las que surgen del Artículo 1042 del Código Civil.[4] Véase Ramírez Ortiz v. Gautier Benítez, 87 D.P.R. 497 (1963); véase también Santoni v. Federal Deposit Ins. Corp., 677 F.2d 174, 178 (1982). El Tribunal Supremo ha definido la declaración unilateral de voluntad como:

> [L]a promesa o expresión de voluntad unilateral [...] por la que, con certeza, nos imponemos la firme obligación de dar, hacer o no hacer alguna cosa en provecho de otro, **capaz de conferir a éste el derecho de exigir su cumplimiento o el de resarcirse de los consecuentes daños y perjuicios** [...]

Ramírez Ortiz v. Gautier Benítez, *supra*, pág. 508 (énfasis nuestro) (texto entre corchetes añadido).

74. Se ha determinado que para que una declaración de voluntad sea vinculante deben concurrir los siguientes elementos: (1) la voluntad de la persona que pretende obligarse; (2) la capacidad legal suficiente del obligado; (3) una intención clara de obligarse; (4) que la obligación tenga objeto; (5) que exista certeza sobre la forma y el contenido de la obligación; (6) la obligación surja de un acto jurídico idóneo; y (7) el

---

[4] Este artículo dispone lo siguiente: "[l]as obligaciones nacen de la ley, de los contratos y cuasicontratos, y de los actos y omisiones ilícitos o en que intervenga cualquier género de culpa o negligencia". 31 L.P.R.A. § 2992.

contenido de la obligación no sea contrario a la ley, a la moral ni al orden público. Véase Ortiz v. P.R. Telephone Co., 162 D.P.R. 715, 725-726 (2004).

75. Si concurren los anteriores requisitos, la declaración unilateral de voluntad vinculará al promitente desde el momento que la efectúa y quedará sujeto a indemnizar los daños y perjuicios que provoque a raíz de su incumplimiento. *Id.* a la pág. 726; véase también Artículo 1054, 31 L.P.R.A. § 3018.

76. El término aplicable para ejercitar la acción en reclamo de los derechos que emanen del incumplimiento con la obligación contraída mediante la declaración unilateral de voluntad es de 15 años conforme al Artículo 1864 del Código Civil.[5]

77. Según discutido anteriormente, había una inequívoca intención de los accionistas mayoritarios de a hacer a los demandantes accionistas de las Corporaciones. Dicha voluntad fue manifestada por Larrea French y Cook, en representación de las Corporaciones, a los comparecientes mediante una oferta, que incluyó el por ciento de participación y la aportación de capital que cada uno de los Accionistas Minoritarios tenían que a hacer. Es ante esta declaración unilateral de voluntad que los Accionistas Minoritarios reclaman su derecho de que los accionistas mayoritarios y las Corporaciones cumplan con su obligación de reconocerlos como accionistas.

78. De lo contario, los accionistas mayoritarios y las Corporaciones tendrían la obligación de resarcir a los Accionistas Minoritarios por los daños y perjuicios causados, siendo dichos daños en una cantidad no menor del valor de sus acciones, incluyendo las cantidades que les corresponderían a los Accionistas Minoritarios en cualquier distribución de dividendos de las Corporaciones.

79. Por otra parte, no reconocer la obligación que genera la manifestación unilateral de voluntad se puede interpretar como una conducta de proceder en contra de los actos propios. Dicha doctrina establece que una vez una parte ha asumido una conducta con la cual creó un estado de derecho que ganó la confianza de una tercera persona, quien descansa y actúa a base de ésta, se ve luego impedido de asumir una posición contradictoria a la que previamente había representado. International General Electric v. Concrete Builders, 104 D.P.R. 871, 876-878 (1976).

80. La conducta y los actos afirmativos de los accionistas mayoritarios crearon la expectativa y confianza en los Accionistas Minoritarios sobre su participación como

---

[5] El Artículo 1864 dispone que "las [acciones] personales que no tengan término especial" prescribirán a los 15 años. 31 L.P.R.A. § 5294.

14

accionistas en las Corporaciones. Ante esto, los accionistas mayoritarios y las Corporaciones tienen la obligación de cumplir con su promesa y reconocer a los comparecientes como accionistas. Cook, Gómez y las Corporaciones no pueden ir ahora en contra de sus propios actos y negarles a los Accionistas Minoritarios su derecho de participación.

### IV. Fianza de No Residentes

81. En cumplimiento con la Regla 69.5 de Procedimiento Civil de Puerto Rico, sobre fianza de no residentes, se acompaña a la presente Demanda un cheque certificado, número 103103400019326, por la suma de $1,000.00 a nombre del Secretario del Tribunal para su correspondiente consignación. Al respecto, Francisco G. Larrea French y María Larrea respetuosamente solicitan a este Honorable Tribunal que estime dicha suma como garantía suficiente.[6]

**POR TODO LO CUAL,** los comparecientes muy respetuosamente solicitan de este Honorable Tribunal que declare con lugar la presente Demanda, con los siguientes pronunciamientos:

i. Que los comparecientes son accionistas minoritarios de Glaze On Investments, Inc. y/o Caribbean Glaze Corporation;

ii. Que se ordene a Glaze On Investments, Inc. y/o Caribbean Glaze Corporation y a John Mathew Cook y Ellysmar Gómez Luzardo a cumplir con el contrato de suscripción, incluyendo, pero sin limitarse, a reconocer a los comparecientes como accionistas y emitir los correspondientes certificados de acciones;

iii. Que los accionistas mayoritarios se obligaron mediante una declaración unilateral de voluntad vinculante a reconocer a los comparecientes como accionistas de Glaze On Investments, Inc. y/o Caribbean Glaze Corporation;

iv. Que se le imponga a los demandados la obligación de resarcir a los comparecientes por los daños y perjuicios causados, siendo dichos daños en una cantidad no menor del valor de sus acciones, incluyendo las cantidades que les corresponderían a los comparecientes en cualquier distribución de dividendos de Glaze On Investments, Inc. y/o Caribbean Glaze Corporation; y

---

[6] De los once demandantes, sólo dos residen en Florida. En adición, el co-demandante Francisco G. Larrea French, trabaja en Miami, Florida para SARCO, una de las entidades del Grupo Larrea en Puerto Rico, por lo que devenga salarios y paga impuestos en Puerto Rico. Por lo tanto, Francisco G. Larrea French es una parte que tiene contactos directos con esta jurisdicción.

  v. Que la suma de $1,000.00 por la presente consignada es garantía suficiente bajo la Regla 69.5, *supra*, sobre fianza de no residentes.

**RESPETUOSAMENTE SOMETIDA.**

En San Juan, Puerto Rico, a 10 de junio de 2014.

**TORO, COLÓN, MULLET,
RIVERA & SIFRE, P.S.C.**
416 Ave. Ponce de León
Union Plaza Suite 311
San Juan, PR 00918
Tel: (787) 751-8999
Fax: (787) 763-7760
Abogados de Accionistas
Minoritarios

*[signature]*

**MANUEL FERNÁNDEZ BARED**
RUA Núm.: 8,801
E-mail: mfb@tcmrslaw.com

*[signature]*

**LINETTE FIGUEROA TORRES**
RUA Núm.: 16,396
Email: lft@tcmrslaw.com

16