Exhibit 33

ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE PRIMERA INSTANCIA
SALA SUPERIOR DE SAN JUAN

JOHN MATTHEW COOK Y ELLYSMAR
GÓMEZ LUZARDO,

     Demandantes,

         vs.             Civil Núm.: K PE2013-5152 (904)

CARIBBEAN GLAZE CORPORATION;
GLAZE ON INVESTMENTS, INC.;
F. GERARDO LARREA OLOZAGA;
JUAN ANTONIO LARREA FRENCH;

     Demandados.

## CONTESTACIÓN A "PETICIÓN DE MANDAMUS" O DEMANDA Y RECONVENCIÓN

AL HONORABLE TRIBUNAL:

     Comparecen los codemandados, el Sr. Gerardo Larrea y el Sr. Juan Antonio Larrea, por conducto de los abogados que suscriben, y muy respetuosamente contestan la "Petición de Mandamus" de los demandantes:

**I.**    <u>JURISDICCIÓN Y COMPETENCIA</u>

     1.   No requiere alegación responsiva de los comparecientes. En la alternativa, se admite.

**II.**  <u>LAS PARTES</u>

     2.   Se admite que el codemandante John Matthew Cook ("Cook") es mayor de edad, soltero, vecino de San Juan, Puerto Rico, miembro de la Junta de Directores de Caribbean Glaze Corporation ("CGC"), y Presidente y Principal Oficial Ejecutivo de dicha compañía; que CGC opera la franquicia de donas Krispy Kreme en Puerto Rico; que Glaze On Investment, Inc. ("GOI") es tenedora del 100% de las acciones de CGC; y que CGC es una subsidiaria de GOI. El resto de lo alegado se niega. Se alega afirmativamente que Cook posee el 21% de interés propietario de GOI; y que un grupo de accionistas minoritarios posee el 16% de interés propietario de la referida corporación.

     3.   Se admite que la codemandante Ellysmar Gómez Luzardo

("Gómez") es mayor de edad, soltera, vecina de San Juan, Puerto Rico y Tesorera de CGC; que CGC opera la franquicia de donas Krispy Kreme en Puerto Rico; que GOI es tenedora del 100% de las acciones de CGC; y que CGC es una subsidiaria de GOI. El resto de lo alegado se niega. Se alega afirmativamente que Gómez posee el 21% de interés propietario de GOI; y que un grupo de accionistas minoritarios posee el 16% de interés propietario de la referida corporación.

4.   Se admite que el codemandado, el Sr. Juan Antonio Larrea, es mayor de edad, casado, vecino de San Juan, Puerto Rico, Presidente de la Junta de Directores de CGC/GOI y Presidente de GOI; que CGC opera la franquicia de donas Krispy Kreme en Puerto Rico; que GOI es tenedora del 100% de las acciones de CGC; y que CGC es una subsidiaria de GOI. El resto de lo alegado se niega. Se alega afirmativamente que el Sr. Juan Antonio Larrea posee el 21% de interés propietario de GOI; y que un grupo de accionistas minoritarios posee el 16% de interés propietario de la referida corporación.

5.   Se admite que el codemandado, el Sr. Gerardo Larrea, es mayor de edad, casado, vecino de Guaynabo, Puerto Rico y miembro de la Junta de Directores de CGC; que CGC opera la franquicia de donas Krispy Kreme; que GOI es tenedora del 100% de las acciones de CGC; y que CGC es una subsidiaria de GOI. El resto de lo alegado se niega. Se alega afirmativamente que el Sr. Gerardo Larrea posee el 21% de interés propietario de GOI; y que un grupo de accionistas minoritarios posee el 16% de interés propietario de la referida corporación.

6.   Se admite.

7.   Se admite.

III. **LOS HECHOS**

8.   Se admite. Se alega afirmativamente que el Sr. Juan Antonio Larrea es Presidente de la Junta de Directores de

2

CGC/GOI y Presidente de GOI.

    9.  Se admite.

    10.  Se admite.

    11.  Se niega por contener una exposición incompleta, sesgada, y acomodaticia de los hechos con la cual los comparecientes no están de acuerdo. Se alega afirmativamente que los comparecientes tienen interés en declarar y pagar dividendos en CGC, pero el momento en el cual se hizo la solicitud no era apropiado ya que: (1) CGC tenía obligaciones financieras de sobre $4.2 millones; (2) CGC tenía obligaciones de apertura de tres tiendas nuevas con un requerimiento de inversión de sobre $4.5 millones; (3) la economía de Puerto Rico estaba en recesión; (4) CGC se encontraba en su tercer año de ventas comparables negativas; (5) no se habían adoptado documentos corporativos; y (6) no se habían integrado los accionistas minoritarios, por lo que entendían que era incorrecto pagar un dividendo dejando fuera el 16% de los accionistas.

    12.  Se admite únicamente que la información financiera expuesta en el Par. 12 de la "Petición de Mandamus" es correcta. Se niegan las conclusiones a las cuales llegan los demandantes con esta información. El resto de lo alegado se niega por contener una exposición incompleta, sesgada, y acomodaticia de los hechos con la cual los comparecientes no están de acuerdo. Se alega afirmativamente que el 20 de agosto de 2012, Cook y Gómez enviaron una carta a la Junta de Directores de CGC que incluye las cantidades y porcientos mencionados en el Par. 12, y solicitando la declaración de $4 millones en dividendos. Además, se alega afirmativamente que el 14 de noviembre de 2012, el Sr. Juan Antonio Larrea respondió a la carta de 20 de agosto diciendo que estaban "dispuestos e interesados en evaluar la declaración y pago de dividendos en CGC", pero que no era el momento para hacerlo ya que: (1) las tiendas número 5 y 6 no

habían abierto todavía; (2) CGC se encontraba en su cuarto año consecutivo de ventas comparables negativas; (3) la economía de Puerto Rico continuaba en recesión; (4) no se habían adoptado documentos corporativos; y (5) todavía no se había cumplido con el compromiso realizado a los accionistas minoritarios de hacerlos partícipes del 16% de las acciones de CGC. El Sr. Juan Antonio Larrea enfatizó que era "necesario esperar hasta que se abran las tiendas 5 y 6 para poder analizar el comportamiento de las ventas comparables, y cumplir nuestra promesa a los accionistas minoritarios, antes de poder atender el pago de dividendos".

13. Se admite únicamente que la información financiera expuesta en el Par. 13 de la "Petición de Mandamus" es correcta. Se niegan las conclusiones a las cuales llegan los demandantes con esta información. El resto de lo alegado se niega por contener una exposición incompleta, sesgada, y acomodaticia de los hechos con la cual los comparecientes no están de acuerdo. Se alega afirmativamente que el 20 de agosto de 2012, Cook y Gómez enviaron una carta a la Junta de Directores de CGC que incluye las cantidades mencionadas en el Par. 13 de la "Petición de Mandamus", y solicitando la declaración de $4 millones en dividendos. *Véase*, además, el Par. 12 de esta Contestación.

14. Se admite.

15. Se niega por contener una exposición incompleta, sesgada, y acomodaticia de los hechos con la cual los comparecientes no están de acuerdo. Se alega afirmativamente que el 14 de noviembre de 2012, el Sr. Juan Antonio Larrea respondió a la carta de 20 de agosto de 2012 diciendo que estaban "dispuestos e interesados en evaluar la declaración y pago de dividendos en CGC", pero que no era el momento para hacerlo ya que: (1) las tiendas número 5 y 6 no habían abierto todavía; (2) CGC se encontraba en su cuarto año consecutivo de ventas

comparables negativas; (3) la economía de Puerto Rico continuaba
en recesión; (4) no se habían adoptado documentos corporativos;
y (5) todavía no se había cumplido con el compromiso realizado
a los accionistas minoritarios de hacerlos partícipes del 16% de
las acciones de CGC. El Sr. Juan Antonio Larrea enfatizó que era
"necesario esperar hasta que se abran las tiendas 5 y 6 para
poder analizar el comportamiento de las ventas comparables, y
cumplir nuestra promesa a los accionistas minoritarios, antes de
poder atender el pago de dividendos".

16.  Se niega por contener una exposición incompleta,
sesgada, y acomodaticia de los hechos con la cual los
comparecientes no están de acuerdo. Se niega que los fundamentos
expuestos por los comparecientes para posponer la declaratoria y
pago de dividendos sea infundada. Se alega afirmativamente que
el 15 de noviembre de 2012, Gómez y Cook enviaron una carta  a
los comparecientes (con fecha de 14 de noviembre) exponiendo su
posición sobre la declaratoria y pago de dividendos.

17.  Se admite únicamente que el 1 de febrero de 2013,
Gómez envió una carta a la Junta de Directores de CGC en la que
expone su posición sobre la distribución de dividendos y el
alegado incumplimiento de CGC con obligaciones establecidas en
el Código de Rentas Internas. En la carta, Gómez solicita
nuevamente la distribución de $4 millones en dividendos. El
resto de lo alegado se niega por contener una exposición
incompleta, sesgada, acomodaticia y errada de los hechos y el
derecho aplicable con la cual los comparecientes no están de
acuerdo. CGC no se encuentra en una situación altamente riesgosa
con el Departamento de Hacienda de Puerto Rico, ni se expone a
penalidades. Se alega afirmativamente que el 11 de febrero de
2013, el Sr. Juan Antonio Larrea envió una carta a Gómez
informando que:

…[J]amás ha sido ni es la intención de los accionistas de la corporación … el evadir nuestras obligaciones contributivas personales como para justificar unas penalidades contributivas extraordinarias y menos aún, usar la corporación para fines ilegales. Todo lo contrario, las razones que nos han motivado siempre sobre el tema de los dividendos- razones que hemos explicado a la saciedad tanto en las reuniones de directores como por escrito, siendo nuestra comunicación más reciente la del 14 de noviembre de 2012 y **que han causado un impasse entre los cuatro directores en la Junta**- son legítimas, serias, y de peso, y persiguen proteger los mejores intereses de la corporación. Como hemos explicado anteriormente, creemos en el uso prudente del capital corporativo en la expansión de las operaciones y evitar distribuciones prematuras de dividendos. También hay que tomar en consideración que distribuir dividendos sin incluir a personas que todos hemos acordado y reconocido como accionistas minoritarios desde el principio, expondría a la corporación a responsabilidad frente a esos terceros. (Énfasis añadido).

18.   Se niega por contener una exposición incompleta, sesgada, y acomodaticia de los hechos con la cual los comparecientes no están de acuerdo. Los demandantes no son los que mejor conocen las necesidades operacionales de CGC. Se alega afirmativamente que, a partir de mediados del 2010, los demandantes se han autoimpuesto un papel protagónico en las operaciones diarias de CGC y han dejado fuera ("lock out") a los comparecientes, accionistas y directores de la corporación, de la toma de decisiones importantes del negocio, a pesar de las múltiples peticiones de los comparecientes para: (1) tener acceso a la información financiera de la corporación, como por ejemplo los estados  mensuales de las cuentas bancarias de CGC; (2) participar en la operación y toma de decisiones de la compañía; y (3) que se celebren reuniones de la Junta de Directores. Además, se alega afirmativamente que los demandantes solicitan que se declaren y paguen dividendos a solamente cuatro de los accionistas de CGC, a pesar de que dicha compañía se encuentra en su cuarto año consecutivo de ventas comparables negativas; la economía de Puerto Rico continua en recesión; y no

se ha cumplido con el compromiso realizado a los accionistas minoritarios de hacerlos partícipes del 16% de las acciones de CGC. En efecto, los demandantes exponen a la corporación a reclamaciones judiciales al negar y rechazar la existencia de estos accionistas aún cuando ambos participaron de la determinación de los accionistas de CGC; y estuvieron de acuerdo en el por ciento de participación de cada uno. Los demandantes, directores y accionistas de la corporación, violan su deber de fiducia al promover intereses personales sobre los beneficios y mejores intereses de la corporación.

19. Se niega por contener una exposición incompleta, sesgada, acomodaticia y errada de los hechos y el derecho aplicable con la cual los comparecientes no están de acuerdo. Los demandantes no han ejercido su juicio razonable del negocio y las ganancias retenidas no son excesivas ni violan la ley. Se alega afirmativamente que las razones ofrecidas por los comparecientes para aplazar la declaración de dividendos son para beneficio y protección de los mejores intereses de la corporación y, por tanto, se encuentran cobijadas bajo la regla del juicio comercial o "business judgment rule". Declarar y pagar dividendos prematuramente a solamente cuatro de los accionistas de CGC expondría a la corporación a responsabilidad frente a los accionistas minoritarios, además de comprometer el capital corporativo de CGC que es necesario para la expansión de las operaciones y el cumplimiento de los acuerdos con el franquiciador. *Véase*, además, Par. 18 de esta Contestación.

20. Se admite únicamente que no se han declarado dividendos en CGC y que la información financiera expuesta en el Par. 20 de la "Petición de Mandamus" es correcta. Se niegan las conclusiones a las cuales llegan los demandantes con esta información financiera. El resto de lo alegado se niega por contener una exposición incompleta, sesgada, acomodaticia y

errada de los hechos y el derecho aplicable con la cual los comparecientes no están de acuerdo. *Véase* Par. 18 y 19 de esta Contestación.

21.   Se admite únicamente que la información financiera expuesta en el Par. 21 de la "Petición de Mandamus" es correcta. Se niegan las conclusiones a las cuales llegan los demandantes con esta información. El resto de lo alegado se niega por contener una exposición incompleta, sesgada, acomodaticia y errada de los hechos y el derecho aplicable con la cual los comparecientes no están de acuerdo. *Véase* Par. 19.

22.   Se admite únicamente que el bufete Pietrantoni Méndez & Álvarez, LLC ("PMA") y la firma Kevane Grant Thornton ("Kevane") emitieron opiniones sobre la alegada obligación contributiva de CGC en relación a las ganancias acumuladas, a petición de los demandantes y sin la participación de los comparecientes ni el aval de la Junta de Directores. El resto de lo alegado se niega por contener una exposición incompleta, sesgada, acomodaticia y errada de los hechos y el derecho aplicable con la cual los comparecientes no están de acuerdo. Se alega afirmativamente que el 6 de marzo de 2013, Kevane - auditores externos independientes de CGC - rectificó su opinión previa y expresó que al momento de preparar la opinión del 1 de febrero "desconocía de la existencia de las desavenencias entre los accionistas de la corporación...". Además, Kevane indicó que no estaban ofreciendo "recomendación alguna con respecto a la necesidad y/o deseabilidad de declarar dividendos, a la cantidad de ganancias que debe y/o puede retenerse ni la cantidad que puede ser utilizada para el pago de dividendos, ni una opinión con respecto a ninguno de estos extremos". En efecto, Kevane realizó una auditoría al finalizar el año fiscal el 26 de mayo de 2013, y emitió una opinión favorable sobre los estados financieros de CGC. Kevane no hizo señalamiento alguno con

respecto a las alegadas ganancias retenidas en exceso ni el alegado riesgo de multas por el Departamento de Hacienda.

23. Se admite únicamente que la información financiera expuesta en el Par. 23 de la "Petición de Mandamus" es correcta y que Kevane incluye esta información financiera en la opinión de 1 de febrero de 2013. Se niegan las conclusiones a las cuales los demandantes y Kevane llegan con esta información. Se niega, además, que el cálculo realizado por Kevane para determinar los ingresos acumulados de la compañía sea correcto. Kevane no tomó en consideración los "net liquid assets" de la compañía. El resto de lo alegado se niega por contener una exposición incompleta, sesgada, acomodaticia y errada de los hechos y el derecho aplicable con la cual los comparecientes no están de acuerdo. *Véase*, además, Par. 22 de esta Contestación.

24. Se niega por contener una exposición incompleta, sesgada, acomodaticia y errada de los hechos y el derecho aplicable con la cual los comparecientes no están de acuerdo. *Véase* Par. 15 y 17 de esta Contestación. Además, se alega afirmativamente que los Larrea no se oponen a la distribución de dividendos pero entienden que el momento no es apropiado.

25. No requiere alegación responsiva de los comparecientes. En la alternativa, se admite que el Par. 25 de la "Petición de Mandamus" transcribe parcialmente el texto de la Sección 1102-2 del Código de Rentas Internas de Puerto Rico, 13 L.P.R.A. § 30075.

26. Se niega por contener una exposición incompleta, sesgada, y acomodaticia de los hechos con la cual los comparecientes no están de acuerdo. Se alega afirmativamente que los comparecientes poseen el 42% de interés propietario de GOI; y que CGC no se encuentra en riesgo de penalidades contributivas de parte del Departamento de Hacienda. Las razones ofrecidas por los comparecientes en la comunicación de 14 de noviembre de 2012

para posponer la declaratoria de dividendos son para beneficio y protección de los mejores intereses de la corporación y, por tanto, se encuentran cobijadas bajo la regla del juicio comercial o "business judgment rule". Declarar y pagar dividendos prematuramente a solamente cuatro de los accionistas de CGC, expondría a la corporación a responsabilidad frente a los accionistas minoritarios, además de comprometer el capital corporativo de CGC que es necesario para la expansión de las operaciones y el cumplimiento de los acuerdos con el franquiciador. Se alega afirmativamente que los comparecientes, a pesar de no estar de acuerdo con las alegada posibilidad de penalidades contributivas según los demandantes, accedieron a declarar un dividendo de $1 millón y separar 16% ($160,000) en una cuenta "escrow" hasta que se dilucidara la controversia sobre la participación de los accionistas minoritarios en la corporación. Se alega afirmativamente, además, que a partir de mediados del 2010, los demandantes se han autoimpuesto un papel protagónico en las operaciones diarias de CGC y han dejado fuera ("lock out") a los comparecientes, accionistas y directores de la corporación, de la toma de decisiones importantes del negocio. Los demandantes, directores y accionistas de la corporación, violan su deber de fiducia al promover intereses personales sobre los beneficios y mejores intereses de la corporación.

27.  Se niega por contener una exposición incompleta, sesgada, acomodaticia y errada de los hechos y el derecho aplicable con la cual los comparecientes no están de acuerdo. Se alega afirmativamente que no existe tal obligación ministerial y que a partir de mediados del 2010, los demandantes se han autoimpuesto un papel protagónico en las operaciones diarias de CGC y han dejado fuera ("lock out") a los comparecientes, accionistas y directores de la corporación, de la toma de

decisiones importantes del negocio. Los demandantes, directores y accionistas de la corporación, violan su deber de fiducia al promover intereses personales sobre los beneficios y mejores intereses de la corporación. *Véase* Par. 26 de esta Contestación.

28.  Se niega por contener una exposición incompleta, sesgada, acomodaticia y errada de los hechos y el derecho aplicable con la cual los comparecientes no están de acuerdo. Se alega afirmativamente que a partir de mediados del 2010, los demandantes se han autoimpuesto un papel protagónico en las operaciones diarias de CGC y han dejado fuera ("lock out") a los comparecientes, accionistas y directores de la corporación, de la toma de decisiones importantes del negocio. Los demandantes, directores y accionistas de la corporación, violan su deber de fiducia al promover intereses personales sobre los beneficios y mejores intereses de la corporación. *Véase* Par. 26 de esta Contestación.

29.  Se niega por contener una exposición incompleta, sesgada, acomodaticia y errada de los hechos y el derecho aplicable con la cual los comparecientes no están de acuerdo. *Véase* Par. 26 de esta Contestación. Se alega afirmativamente que el Sr. Juan Antonio Larrea y el Sr. Gerardo Larrea, a pesar de no estar de acuerdo con la alegada posibilidad de penalidades contributivas según los demandantes, accedieron a declarar un dividendo de $1 millón y separar 16% ($160,000) en una cuenta "escrow" hasta que se dilucidara la controversia sobre la participación de los accionistas minoritarios.

30.  Se niega. Se alega afirmativamente que los demandantes solicitan que se declaren y paguen dividendos a solamente cuatro de los accionistas de CGC, a pesar de que dicha compañía se encuentra en su cuarto año consecutivo de ventas comparables negativas; la economía de Puerto Rico continua en recesión; y no se ha cumplido con el compromiso realizado a los accionistas

11

minoritarios de hacerlos partícipes del 16% de las acciones de CGC. En efecto, los demandantes exponen a la corporación a reclamaciones judiciales al negar y rechazar la existencia de estos accionistas aún cuando ambos participaron de la determinación de los accionistas; y estuvieron de acuerdo en el por ciento de participación de cada uno. Se alega afirmativamente, además, que a partir de mediados del 2010, los demandantes se han autoimpuesto un papel protagónico en las operaciones diarias de CGC y han dejado fuera ("lock out") a los comparecientes, accionistas y directores de la corporación, de la toma de decisiones importantes del negocio. Los demandantes, directores y accionistas de la corporación, violan su deber de fiducia al promover intereses personales sobre los beneficios y mejores intereses de la corporación.

31. Se admite únicamente que los demandantes son accionistas de CGC y GOI desde sus inicios. El resto de lo alegado se niega por contener una exposición incompleta, sesgada, y acomodaticia de los hechos y el derecho aplicable con la cual los comparecientes no están de acuerdo.

## IV. CAUSA DE ACCIÓN DERIVATIVA Y AUTO DE MANDAMUS

32. Se incorporan todas las alegaciones y defensas levantadas en los párrafos 1-31 que anteceden.

33. No requiere alegación responsiva de los comparecientes por constituir una conclusión de derecho. En la alternativa, se niega por contener una exposición incompleta, sesgada, acomodaticia y errada del derecho aplicable con la cual los comparecientes no están de acuerdo.

34. No requiere alegación responsiva de los comparecientes por constituir una conclusión de derecho. En la alternativa, se niega por contener una exposición incompleta, sesgada, acomodaticia y errada del derecho aplicable con la cual los comparecientes no están de acuerdo.

35.   No requiere alegación responsiva de los comparecientes por constituir una conclusión de derecho. En la alternativa, se niega por contener una exposición incompleta, sesgada, acomodaticia y errada del derecho aplicable con la cual los comparecientes no están de acuerdo.

36.   No requiere alegación responsiva de los comparecientes por constituir una conclusión de derecho. En la alternativa, se niega por contener una exposición incompleta, sesgada, acomodaticia y errada del derecho aplicable con la cual los comparecientes no están de acuerdo.

37.   No requiere alegación responsiva de los comparecientes por constituir una conclusión de derecho. En la alternativa, se niega por contener una exposición incompleta, sesgada, acomodaticia y errada del derecho aplicable con la cual los comparecientes no están de acuerdo. El *mandamus* no aplica a los hechos de este caso. Se alega afirmativamente que la declaratoria de dividendos es un acto discrecional de la Junta de Directores, no un deber ministerial sujeto a la imposición de un *mandamus*.

38.   No requiere alegación responsiva de los comparecientes por constituir una conclusión de derecho. En la alternativa, se niega por contener una exposición incompleta, sesgada, acomodaticia y errada del derecho aplicable con la cual los comparecientes no están de acuerdo. El *mandamus* no aplica a los hechos de este caso. Se alega afirmativamente que la declaratoria de dividendos es un acto discrecional de la Junta de Directores, no un deber ministerial sujeto a la imposición de un *mandamus*.

39.   Se niega. El *mandamus* no aplica a los hechos de este caso. Se alega afirmativamente que la declaratoria de dividendos es un acto discrecional de la Junta de Directores, no un deber ministerial sujeto a la imposición de un *mandamus*

13

40.   Se niega por contener una exposición incompleta, sesgada, acomodaticia y errada de los hechos y el derecho aplicable con la cual los comparecientes no están de acuerdo. Se alega afirmativamente que la declaratoria de dividendos es un acto discrecional de la Junta de Directores, no un deber ministerial sujeto a la imposición de un mandamus; y que CGC no se encuentra en riesgo de penalidades contributivas de parte del Departamento de Hacienda por algún alegado incumplimiento con el Código de Rentas Internas. El bufete López, Sánchez, Pirillo & Hymovitz y la firma BDO Puerto Rico, PSC determinaron que la corporación no se encuentra sujeta a un alegado "riesgo contributivo". Además, las razones ofrecidas por los comparecientes en la comunicación de 14 de noviembre de 2012 para posponer la declaratoria de dividendos son para beneficio y protección de los mejores intereses de la corporación y, por tanto, se encuentran cobijadas bajo la regla del juicio comercial o "business judgment rule". Declarar y pagar dividendos prematuramente a solamente cuatro de los accionistas de CGC, expondría a la corporación a responsabilidad frente a los accionistas minoritarios, además de comprometer el capital corporativo de CGC que es necesario para la expansión de las operaciones y el cumplimiento de los acuerdos con el franquiciador. Se alega afirmativamente que el Sr. Juan Antonio Larrea y el Sr. Gerardo Larrea, a pesar de no estar de acuerdo con las alegada posibilidad de penalidades contributivas según los demandantes, accedieron a declarar un dividendo de $1 millón y separar 16% ($160,000) en una cuenta "escrow" hasta que se dilucidara la controversia sobre la participación de los accionistas minoritarios. Finalmente, se alega afirmativamente, que los demandantes, directores y accionistas de la corporación, violan su deber de fiducia al promover intereses personales sobre los beneficios y mejores intereses de la corporación.

14

41.   Se niega por contener una exposición incompleta, sesgada, acomodaticia y errada de los hechos y el derecho aplicable con la cual los comparecientes no están de acuerdo. *Véase* Par. 40 de esta Contestación.

42.   Se niega por contener una exposición incompleta, sesgada, acomodaticia y errada del derecho aplicable con la cual los comparecientes no están de acuerdo. Se alega afirmativamente que la declaratoria de dividendos es un acto discrecional de la Junta de Directores, no un deber ministerial sujeto a la imposición de un *mandamus*.

## DEFENSAS AFIRMATIVAS

1.   La figura del *mandamus* no se puede utilizar para obligar a los directores de una corporación a declarar y pagar dividendos.

2.   La declaratoria y pago de dividendos descansa primordialmente en la sana discreción de los directores de una corporación.

3.   Los comparecientes siempre han cumplido con su deber de fiducia hacia la corporación.

4.   Los comparecientes siempre han cumplido con sus obligaciones legales.

5.   La decisión de los comparecientes de posponer la declaratoria y pago de dividendos es cónsono con y está cobijada bajo la regla del juicio comercial.

6.   Los comparecientes no han actuado con negligencia crasa, fraude o conflicto de interés.

7.   Las corporaciones demandadas no están incumpliendo una obligación contributiva del Departamento de Hacienda.

8.   Las corporaciones demandadas no están en riesgo de penalidades del Departamento de Hacienda.

9.   Los demandantes están obligados a reconocer la participación de los accionistas minoritarios de CGC.

10.   Los demandantes manifestaron unilateralmente la intención de incluir a un grupo de individuos como accionistas minoritarios de CGC.

11.   Los demandantes están obligados por sus propios actos a reconocer la participación de los accionistas minoritarios de CGC.

12.   La Petición de Mandamus o Demanda no expone una reclamación que justifique la concesión de un remedio.

13.   Falta de parte indispensable.

14.   Los demandantes están impedidos de presentar la reclamación de epígrafe.

15.   Los demandantes han incurrido en abuso del derecho al presentar la reclamación de epígrafe.

16.   Los demandantes no vienen con las manos limpias ante este Honorable Tribunal, padecen de un patente conflicto de interés contrario a los mejores intereses de la corporación y violan el deber de fiducia que tienen hacia CGC.

17.   Los comparecientes fueron diligentes en todo momento.

18.   Los comparecientes, a pesar de no estar de acuerdo con las alegada posibilidad de penalidades contributivas según los demandantes, accedieron a declarar un dividendo de $1 millón y separar 16% ($160,000) en una cuenta "escrow" hasta que se dilucidara la controversia sobre la participación de los accionistas minoritarios.

19.   Los demandantes han sido temerarios al presentar la presente reclamación.

20.   Los demandantes pretenden enriquecerse injustamente.

21.   Los comparecientes se reservan el derecho de enmendar esta contestación y levantar defensas afirmativas adicionales de

acuerdo al descubrimiento de prueba que se lleve a cabo en el caso.

## RECONVENCIÓN

Habiendo contestado la "Petición de Mandamus" y presentado las defensas afirmativas, el Sr. Gerardo Larrea y el Sr. Juan Antonio Larrea reconvienen en contra de los demandantes según se expone a continuación:

I.   **LAS PARTES**

1.   El codemandado-reconviniente, el Sr. Gerardo Larrea, es miembro de la Junta de Directores de Caribbean Glaze Corporation ("CGC") y posee el 21% de interés propietario de las acciones de Glaze On Investment, Inc. ("GOI").

2.   El codemandado-reconviniente, el Sr. Juan Antonio Larrea, es Presidente de la Junta de Directores de CGC/GOI, Presidente de GOI y posee el 21% de interés propietario de las acciones de GOI.

3.   El codemandante-reconvenido, el Sr. John Cook ("Cook"), es miembro de la Junta de Directores de CGC, Presidente y CEO de dicha compañía, y posee el 21% de interés propietario de las acciones de GOI.

4.   La codemandante-reconvenida, la Sra. Ellysmar Gómez ("Gómez"), es miembro de la Junta de Directores de CGC, Tesorera de dicha compañía, y posee el 21% de interés propietario de las acciones de GOI.

5.   GOI es una corporación organizada bajo las leyes del Estado Libre Asociado de Puerto Rico, con oficinas principales en Royal Industrial Park, Edificio J2, Carretera 869, Bo. Palmas, Cataño, P.R. 00962. GOI es la compañía tenedora del 100% de las acciones de CGC.

6.   CGC es una corporación organizada bajo las leyes del Estado Libre Asociado de Puerto Rico, con oficinas principales en Royal Industrial Park, Edificio J2, Carretera 869, Bo.

Palmas, Cataño, P.R. 00962. CGC opera la franquicia de Krispy Kreme.

## II. HECHOS RELEVANTES A TODAS LAS CAUSAS DE ACCIÓN

### A. *Historia del Grupo Larrea e introducción de Krispy Kreme en Puerto Rico.*

1.   El Grupo Larrea se compone de las siguientes corporaciones: IRSI (corporación que opera Chili's, Romano's Macaroni Grill, On the Border y P.F. Chang's), South American Restaurant Corp. ("SARCo") (corporación que opera Church's Chicken), P.T. Inc. (corporación que opera Pollo Tropical), CGC (corporación que opera Krispy Kreme) y South American Capital Corp. (corporación de bienes raíces).

2.   El Sr. Gerardo Larrea es el *Chief Executive Officer* de todas las corporaciones mencionadas en el Par. 2 (excepto CGC), y el Sr. Juan Antonio Larrea es Presidente de South American Restaurant Corp. y P.T. Inc.; Chairman de CGC; y Presidente de South American Capital Corp.

3.   En el 1976, el Sr. Gerardo Larrea, junto con el Sr. Manuel Albarrán y H.J. Heinz Company, adquirió Caribbean Restaurants, Inc. ("CRI"), la franquicia exclusiva de Burger King en Puerto Rico. Bajo la presidencia del Sr. Gerardo Larrea (hasta el 1996), Burger King aumentó de 18 a 115 unidades en Puerto Rico.

4.   En el 1978, el Grupo Larrea introdujo la cadena Church's Chicken en Puerto Rico. Actualmente, existen 115 unidades de dicha franquicia.

5.   En el 1994, el Grupo Larrea introdujo la cadena Chili's en Puerto Rico. Actualmente, existen 20 unidades de dicha franquicia.

6.   En el 1995, el Grupo Larrea introdujo Pollo Tropical en Puerto Rico. Actualmente, existen 18 unidades de dicha franquicia.

7.   En el 2001, el Grupo Larrea introdujo Romano's Macaroni Grill en Puerto Rico. Actualmente, existen 7 unidades de dicha franquicia.

8.   En el 2008, el Grupo Larrea introdujo Krispy Kreme en Puerto Rico. Actualmente, existen 5 unidades de dicha franquicia.

9.   En el 2009, el Grupo Larrea introdujo On the Border en Puerto Rico. Actualmente, existen 2 unidades de dicha franquicia.

10.  En el 2011, el Grupo Larrea introdujo P.F. Chang's en Puerto Rico. Actualmente, existen 2 unidades de dicha franquicia.

11.  Como se puede observar, el Grupo Larrea ha sido un pionero en la industria de restaurantes en Puerto Rico, introduciendo y desarrollando sobre 300 unidades de las diferentes franquicias.

12.  Actualmente, el Grupo Larrea es dueña y opera 169 restaurantes en Puerto Rico.

13.  Debido a su trayectoria y éxito en la industria de los restaurantes por más de 37 años, el Grupo Larrea: (1) tiene un amplio conocimiento sobre la industria de los restaurantes en Puerto Rico; (2) tiene múltiples relaciones de negocios con diferentes dueños de franquicias; (3) tiene conocimiento sobre el mercado de las bienes raíces en Puerto Rico; (4) tiene conocimiento sobre el mercado laboral; (5) tiene contactos claves y relaciones estratégicas establecidas; (6) tiene un amplio conocimiento de la dinámica y tendencias del mercado local; (7) tiene un historial de excelencia operativa y marcaria; (8) tiene lazos fuertes con la comunidad; y (9) tiene relaciones estrechas de negocio con diferentes bancos en Puerto Rico.

14.   El Sr. Juan Antonio Larrea y Cook se conocieron en el 1985, mientras hacían sus estudios universitarios en Estados Unidos.

15.   Cook comenzó a trabajar en Burger King, recomendado por el Sr. Juan Antonio Larrea.

16.   Para el 1990, el Sr. Juan Antonio Larrea conoció a Gómez mientras estudiaban la maestría en Estados Unidos.

17.   Para esa misma época, Cook y Gómez se conocieron a través del Sr. Juan Antonio Larrea.

18.   En el 1998, el Sr. Gerardo Larrea se comunicó con el Sr. Juan Antonio Larrea para que éste trabajara en SARCo como Vicepresidente de *Business Development and Special Projects*. En el 2000, fue promovido a Presidente.

19.   Para cubrir la vacante de Vicepresidente, el Sr. Juan Antonio Larrea se comunicó con Gómez para ofrecerle la posición. Gómez aceptó y comenzó a trabajar para SARCo.

20.   Luego de varios años, Cook llegó a ser Presidente de Burger King en Argentina, Chile, Uruguay y Paraguay por recomendación del Sr. Gerardo Larrea. Esta compañía se llamaba Fast Food Sudamericana y era una afiliada del Grupo Larrea.

21.   Por su parte, Gómez fue Vicepresidenta y *Chief Financial Officer* de SARCo.

22.   En el 2002, Cook, por acuerdo y en representación del Sr. Gerardo Larrea, Sr. Juan Antonio Larrea y Gómez, se comunicó con la oficina de Philip Waugh, Vicepresidente Ejecutivo de Krispy Kreme, para discutir la posibilidad de desarrollar Krispy Kreme en Puerto Rico. Aunque Cook no pudo comunicarse directamente con el Sr. Waugh, en ese momento se le informó que un desarrollador local había sido designado para Puerto Rico.

23.   El 5 de marzo de 2002, el Sr. Juan Antonio Larrea envió una carta a Scott Livengood, Chairman, CEO y Presidente de Krispy Kreme Doughnuts, reiterando el interés de desarrollar la

marca Krispy Kreme en Puerto Rico. La carta se envió con el membrete de SARCo y enfatizando el historial de SARCo en la industria de restaurantes en Puerto Rico.

24. Los intentos iniciales de establecer contacto con Krispy Kreme resultaron infructuosos. Sin embargo, a través de uno de los abogados corporativos del Grupo Larrea, el Sr. Juan Antonio Larrea, Cook y Gómez pudieron establecer comunicaciones con la franquicia.

25. En el 2003 se llevó a cabo la primera reunión con Krispy Kreme. En esta reunión se enfatizó nuevamente la participación del Grupo Larrea. Sin embargo, Krispy Kreme escogió a otra corporación para introducir la franquicia en Puerto Rico.

26. A raíz de esta decisión, el Grupo Larrea obtuvo cartas de recomendación de otras de sus franquicias y de Pepsi. Todas las cartas hablaban del éxito del Grupo Larrea en Puerto Rico y del Sr. Juan Antonio Larrea.

27. El 22 de julio de 2003, el Sr. Juan Antonio Larrea, Cook y Gómez se reunieron nuevamente con Krispy Kreme para mostrar una presentación que explicaba la experiencia y trayectoria del Grupo Larrea en Puerto Rico.

28. Ese mismo día, el Sr. Waugh entregó el borrador de la carta de intención para comenzar a negociar el contrato de franquicia de Krispy Kreme.

29. El 7 de agosto de 2003, el Sr. Juan Antonio Larrea (como Presidente de SARCo) y el Sr. Waugh firmaron la carta de intención.

30. Conforme a la carta de intención, las partes acordaron incorporar a CGC bajo las leyes de Puerto Rico. El Grupo Larrea, o una de sus afiliadas, tendría el 70% de las acciones de CGC, y Krispy Kreme International Ltd, o una de sus afiliadas, tendría el 30%.

31. En el 2003, el Lcdo. Gilberto Marxuach incorporó a CGC. En el 2004, el Lcdo. Jacobo Ortíz incorporó a GOI.

32. El 22 de julio de 2004, las partes firmaron el "Franchise and Development Agreement"; se establecieron los artículos constitutivos de CGC; se subscribió el acuerdo de accionistas de CGC; y se creó el modelo de empresa conjunta para la operación de Krispy Kreme en Puerto Rico. El Sr. Juan Antonio Larrea, el Sr. Gerardo Larrea, Cook y Gómez contribuyeron $87,500.00 cada uno.

33. Además, en esta fecha, First Bank otorgó el financiamiento de $5 millones para adquirir y operar Krispy Kreme. First Bank es el banco principal del Grupo Larrea y, debido al historial de negocios con dicho grupo, no requirió garantías personales  para el financiamiento; ofreció tasas de interés inigualables en el mercado; y con menos del 9% de capital con 91% de deuda.

34. En agosto de 2004, Cook  preparó un "Action Plan – TIMELINE" y determinó los pasos a seguir para configurar a CGC. Uno de estos pasos era: determinar la constitución de los accionistas de CGC. El responsable de preparar la lista era el Sr. Juan Antonio Larrea. El documento, además, incluía una lista de accionistas de CGC y otra de GOI, ambas con la participación de accionistas minoritarios.

35. En el 2005, debido a problemas en el mercado de Krispy Kreme a nivel internacional, las partes y Krispy Kreme renegociaron los términos de la empresa conjunta; y se firmó la primera enmienda del acuerdo de franquicia.

36. En el 2006, las partes y Krispy Kreme firmaron el "addendum" al acuerdo de franquicia; se disolvió la empresa conjunta, sobreviviendo solamente GOI con el 100% de las acciones; y se canceló el acuerdo de accionistas de CGC.

37. En el 2008, las partes y Krispy Kreme firmaron el segundo "addendum" del acuerdo de franquicia y se abrió la primera tienda Krispy Kreme en Caguas.

**B.** *Trasfondo e inicios de las discrepancias entre las partes.*

38. Desde el 2003, el Sr. Gerardo Larrea, el Sr. Juan Antonio Larrea, Cook y Gómez comenzaron a discutir la composición e identidad de los accionistas de CGC. Para esta fecha, la lista preliminar de accionistas incluía a Luis Arenas; Cook; Gómez; el Sr. Juan Antonio Larrea; el Sr. Gerardo Larrea; y Louis Tishler.

39. En el 2003-2004 se añadió al Lcdo. Jacobo Ortiz; Artur Jotic; Gabriel Salvat; Arturo Fernández; Lcdo. Gilberto Marxuach; Felipe Flores; Fernando Toro; y Gerardo Larrea Jr. a la lista de accionistas. Además, se comenzó a discutir el por ciento de participación de cada uno.

40. El 23 de abril de 2008, el Sr. Juan Antonio Larrea envió un correo electrónico a Gómez y Cook anejando la lista de accionistas con la contribución y por ciento de participación de cada uno.

41. El 24 de abril de 2008, Gómez contestó el correo electrónico de 23 de abril e indicó que iba a revisar el listado y hacer sus recomendaciones sobre el por ciento de participación de cada accionista.

42. Ese mismo día, Gómez envió un correo electrónico al Sr. Juan Antonio Larrea y Cook discutiendo: (1) el porcentaje de participación de cada accionista; (2) su opinión sobre las personas que debían ser accionistas minoritarios; e (3) incluyó una lista preliminar de los accionistas y el por ciento de participación de cada uno.

43. Esta lista, que constituye una admisión de parte, incluía a Cook, Gómez, el Sr. Gerardo Larrea, el Sr. Juan

Antonio Larrea, Luis Arenas, Lcdo. Jacobo Ortíz, Anita Larrea,
María Larrea, Gerardo Larrea Jr., Arturo Fernández, Felipe
Flores, William Morales, Ivelisse Cordovés, Lcdo. Gilberto
Marxuach y Fernando Toro.

44. El 24 de abril de 2008, el Sr. Juan Antonio Larrea
envió a Gómez y Cook una lista actualizada de los accionistas.
La lista incluía a: Cook, Gómez, el Sr. Gerardo Larrea, el Sr.
Juan Antonio Larrea, Luis Arenas, Lcdo. Jacobo Ortíz, Gerardo
Larrea Jr., Arturo Fernández, Felipe Flores, Ivelisse Cordovés,
Lcdo. Gilberto Marxuach, Fernando Toro, Alex Cerda y María
Larrea.

45. El 2 de mayo de 2008, el Sr. Juan Antonio Larrea envió
a Gómez, Cook y el Sr. Gerardo Larrea la lista final de
accionistas de CGC. La lista incluía a: Cook, Gómez, el Sr.
Gerardo Larrea, el Sr. Juan Antonio Larrea, Luis Arenas, Lcdo.
Jacobo Ortíz, Gerardo Larrea Jr., Arturo Fernández, Felipe
Flores, Ivelisse Cordovés, Lcdo. Gilberto Marxuach, Fernando
Toro, Alex Cerda, María Larrea, y Aniceto Solares. Cook y Gómez
no objetaron la constitución final de los accionistas. *Exhibit
A.*[1]

46. El 16 de octubre de 2008, el Sr. Juan Antonio Larrea
envío la lista final de los accionistas al Lcdo. Pablo
Rodríguez, abogado corporativo de CGC, con copia a Cook, Gómez y
el Sr. Gerardo Larrea. Cook y Gómez tampoco objetaron la
constitución final de los accionistas.

47. Conforme a lo acordado por el Sr. Juan Antonio Larrea,
el Sr. Gerardo Larrea, Cook y Gómez, estos tendrían el 21% del
interés propietario de CGC, para un total de 84% de las
acciones. El resto de los accionistas tendrían en promedio el

---

[1]    Los exhibits de esta moción serán sometidos bajo sello, en una moción
aparte, debido a la naturaleza confidencial de su contenido.

1.5% del interés propietario de CGC, para un total del 16% de las acciones.

48. GOI no ha emitido certificados de acciones a ninguno de sus accionistas, incluyendo el Sr. Gerardo Larrea, el Sr. Juan Antonio Larrea, Cook y Gómez.

49. Los accionistas minoritarios han pagado total o parcialmente las acciones con su trabajo y servicios en beneficio de la corporación.

50. El 13 de enero de 2009, el Lcdo. Rodríguez le envió a Cook y Gómez un listado de los pasos a seguir o etapas necesarias (en total 3) para finalizar la estructura corporativa de CGC y GOI. Entre estos pasos se encontraba adoptar los "by-laws" y emitir las acciones clase A y clase B en GOI; adoptar los "by-laws" y nombrar a los directores oficiales corporativos de CGC; y suscribir acuerdos de accionistas para la clase A y la clase B. En el 2008 se realizó un esfuerzo similar que no rindió resultados.

51. El 13 de julio de 2009, Gómez envió un correo electrónico al Sr. Juan Antonio Larrea sobre la urgencia de emitir las acciones de los minoritarios.

52. Luego de varias comunicaciones con el Sr. Juan Antonio Larrea, Gómez y Cook, el 2 de septiembre de 2009, el Lcdo. Rodríguez circuló los documentos corporativos que formaban parte de la primera etapa de la formación de la estructura corporativa de CGC y GOI.

53. El 5 de noviembre de 2009, Cook le envió un correo electrónico al Lcdo. Rodríguez anejando los borradores de los acuerdos de accionistas para la clase A y clase B, y los "by-laws" de CGC, con sus comentarios.

54. El 10 de noviembre de 2009, el Lcdo. Rodríguez envió nuevamente los referidos documentos corporativos con los cambios

sugeridos por Cook, Gómez y el Sr. Juan Antonio Larrea
incorporados.

55. El 11 de noviembre de 2009, Cook envió un correo
electrónico al Sr. Juan Antonio Larrea y Gómez en el que informó
su anuencia a los documentos corporativos y sugiriendo solamente
cambios mínimos de fácil corrección. No hubo cambios a la
división de las acciones de CGC en clase A y clase B.

56. A pesar de los múltiples intentos de los
comparecientes y el Lcdo. Rodríguez para aprobar y suscribir los
documentos corporativos, Gómez y Cook no firmaron los
documentos. Al día de hoy, no existen "by-laws" ni acuerdo de
accionistas de CGC.

57. En este periodo, además, surgieron diferentes
desavenencias entre los accionistas principales, como por
ejemplo: la inclusión del Sr. Gerardo Larrea como director de la
corporación; la negativa de Cook y Gómez de llevar a cabo
reuniones de la Junta; la necesidad de un quinto director; la
negativa de Cook y Gómez de compartir la información financiera
con los comparecientes; y la exclusión de los comparecientes en
las operaciones diarias del negocio.

58. En marzo de 2010, Cook y Gómez hicieron una petición
para transferir la nómina ejecutiva. El Sr. Gerardo Larrea se
opuso a la transferencia.

59. El 9 de junio de 2010 se llevó a cabo una reunión de
la Junta de Directores en la que se discutió formalmente el tema
de la nómina ejecutiva y se decidió no hacer cambios en ese
momento.

60. El 6 de octubre de 2010 se llevó a cabo otra reunión
de la Junta y el tema de la nómina ejecutiva no fue discutido.

61. En diciembre de 2010, el Sr. Juan Antonio Larrea
solicitó acceso a las cuentas de CGC. Gómez le respondió que,
con respecto a la cuenta de Oriental Bank, los comparecientes

podían llamar para conocer sobre el balance pero, con respecto a
las cuentas de First Bank y Banco Popular, ella tenía que llamar
para configurar el acceso.

62. El 23 de diciembre de 2010, el Sr. Juan Antonio Larrea
envío una carta a Cook cuestionando los estados financieros
preliminares, y el retraso en generarlos.

63. El 2 de mayo de 2011, el Sr. Juan Antonio Larrea envió
un correo electrónico a Cook en el que cuestionó la exclusión de
él y el Sr. Gerardo Larrea de las operaciones y toma de
decisiones de Krispy Kreme, aún siendo accionistas y directores
de la Junta de CGC y dicho negocio haber recibido el apoyo del
Grupo Larrea.

64. El 23 de junio de 2011, el Sr. Juan Antonio Larrea
reiteró su petición de no ser excluido del negocio. *Exhibit B.*

65. El 31 de agosto de 2011, el Sr. Juan Antonio Larrea
envió una carta a Cook reiterando que Cook y Gómez habían tomado
el control operacional de la empresa, excluyendo a los
comparecientes. *Exhibit C.*

66. El 21 de octubre de 2011, el Sr. Juan Antonio Larrea
circuló la agenda para la reunión de la Junta de Directores de
28 de octubre. Entre los temas a discutir se incluía: (1)
estatus de los documentos corporativos; (2) accionistas
minoritarios; y (3) participación de la Junta de Directores en
el negocio.

67. El 28 de octubre de 2011 se llevó a cabo la reunión
según pautada. En la reunión, Cook y Gómez solicitaron mover la
nómina ejecutiva, y la declaración y pago de dividendos a los
cuatro accionistas principales.

68. Los comparecientes, aunque compartieron el deseo de
que se declarasen dividendos, rechazaron la solicitud por no ser
el momento adecuado: (1) CGC tenía obligaciones financieras de
sobre $4.2 millones; (2) CGC tenía obligaciones de apertura de

tres tiendas nuevas con un requerimiento de inversión de sobre $4.5 millones; (3) la economía de Puerto Rico continuaba en recesión; (4) CGC se encontraba en su tercer año de ventas comparables negativas; (5) no se habían adoptado documentos corporativos; y (6) no se habían integrado los accionistas minoritarios. Los comparecientes entendían que era incorrecto pagar un dividendo dejando fuera el 16% de los accionistas.

69.   La Junta informó a los accionistas que estarían evaluando el tema nuevamente una vez se abrieran las tiendas número 5 y 6 para mayo de 2012. Con la apertura de estas tiendas, la Junta iba a tener más información para analizar el comportamiento de las ventas comparables.

70.   En noviembre de 2011, los comparecientes reiteraron la petición de diciembre de 2010 de tener acceso a las cuentas bancarias de la corporación. No obtuvieron el acceso solicitado.

71.   El 19 de diciembre de 2011, los demandantes solicitaron unilateralmente la transferencia la nómina ejecutiva (que incluye el control absoluto del pago de sus propios salarios) sin el aval de la mayoría de los directores.

72.   El 28 de diciembre de 2011, Gómez envió una carta a la Junta de Directores insistiendo en la transferencia de la nómina ejecutiva. Los comparecientes contestaron que estaban abiertos a atender el tema y buscar una solución que satisficiera a todos los directores. La nómina se transfirió finalmente en enero de 2012, sin la aprobación de la Junta.

73.   El primer año que Cook y Gómez eran elegibles para recibir un bono fue el año fiscal 2011.

74.   En este año, Cook solicitó a Maritza Orozco, persona responsable de la nomina ejecutiva de CGC en la oficina del Sr. Gerardo Larrea, el pago de los bonos sin pedir la aprobación de la Junta de Directores.

75.   La Sra. Orozco notificó al Sr. Juan Antonio Larrea de la solicitud de Cook.

76.   El 31 de agosto de 2011, el Sr. Juan Antonio Larrea le respondió a Cook que los bonos estaban aprobados y le recordó que en una de las reuniones de la Junta de Directores de 2010 se solicitó que se estableciera un presupuesto y metas financieras que estuvieran atadas al pago de los bonos. El Sr. Juan Antonio Larrea enfatizó que era necesario que, para el pago de los bonos en el año 2012, se preparara un presupuesto anual; se establecieran metas financieras; y se solicitara la aprobación de la Junta de Directores. *Exhibit P.*

77.   El 23 de enero de 2012, el Sr. Juan Antonio Larrea envió una carta a Cook y Gómez en la que expresó que la decisión unilateral de mover la nómina ejecutiva "está basada en la premisa  falsa de que es meramente la implementación  de una 'decisión de la Junta de principios del 2010' ya que claramente tan reciente como el 28 de octubre de 2011 la Junta no tomó tal decisión sino que por el contrario, no se hizo cambio alguno". *Exhibit D.*

78.   El 24 de enero de 2012, el Sr. Juan Antonio Larrea envió una carta a Cook reiterando el atraso en los estados financieros y expresó, además, que "cabe anotar que en la junta de directores del día 9 de junio de 2010 se propuso establecer metas financieras para Caribbean Glaze, las cuales estarían atadas directamente al programa de bonificación ejecutiva. Aunque esta práctica es bastante común en la industria, Caribbean Glaze aún no ha establecido dichas metas. Es necesario que para el año fiscal 2012 se desarrolle un presupuesto y se establezcan metas financieras atadas al programa de bonificación". *Exhibit Q.*

79.   El 19 de febrero de 2012, Cook respondió a la carta de 24 de enero expresando que no iba a establecer metas ya que eso

no había sido aprobado por la Junta y que iba a utilizar el plan
de trabajo establecido para el año 2003 como meta para pagar los
bonos.

80. Cook y Gómez se pagaron los bonos ejecutivos del año
fiscal 2012 y 2013 sin notificar ni solicitar la aprobación de
la Junta. Para esta fecha, Cook y Gómez tenían control absoluto
de la nómina ejecutiva y las cuentas bancarias.

81. En abril y mayo de 2012, los comparecientes reiteraron
la solicitud de obtener acceso a las cuentas corporativas. En
mayo de 2012, Gómez respondió que "luego de analizar
detenidamente tu solicitud en esta ocasión, como Tesorera de CGC
no me parece apropiado que un director que no es oficial de la
corporación con responsabilidades financieras tenga acceso a las
cuentas bancarias de la compañia a través de internet".

82. El 20 de agosto de 2012, Gómez y Cook enviaron un
memorando a la Junta de Directores de CGC solicitando la
declaración de $4 millones en dividendos.

83. El 14 de noviembre de 2012, los comparecientes
respondieron y reiteraron que: (1) las tiendas número 5 y 6 no
habían abierto todavía; (2) GOI se encontraba en su cuarto año
consecutivo de ventas comparables negativas; (3) la economía de
Puerto Rico continuaba en recesión; y (4) no se había cumplido
con el compromiso realizado a los accionistas minoritarios de
hacerlos partícipes del 16% de las acciones de GOI. Era
necesario esperar hasta que se abrieran las dos tiendas para
analizar el comportamiento de las ventas comparables; y
solicitar la contribución de capital de los accionistas
minoritarios. *Exhibit E.*

84. En esa misma fecha, Cook envió una carta a los
comparecientes rechazando por primera vez la existencia de
accionistas minoritarios en la corporación.

85. El 24 de diciembre de 2012, los demandantes debitaron $5,000,010.00 de la cuenta de Oriental Bank utilizando un cheque de Gerente, sin el aval de la mayoría de los directores.

86. El 16 de enero de 2013, el Sr. Juan Antonio Larrea envió una carta a Gómez cuestionando el débito de $5,000,010.00 de la cuenta de Oriental Bank, y solicitó nuevamente el acceso a las cuentas bancarias de la corporación. *Exhibit F.*

87. El 25 de enero de 2013, PMA envió una carta a CGC, a petición exclusiva de Cook y Gómez en la que discutió las alegadas consecuencias contributivas relacionadas a las ganancias e ingresos acumulados de CGC.

88. El 1 de febrero de 2013, Gómez envió una carta a la Junta de Directores de CGC en la que informó que alegadamente: "[l]a compañía se encuentra en una situación altamente riesgosa con el Departamento de Hacienda de Puerto Rico debido a una excesiva acumulación de ganancias y potencial determinación de evasión contributiva". En la carta solicitó nuevamente la distribución de $4 millones en dividendos.

89. En esa misma fecha, Kevane emitió una opinión sobre la alegada obligación contributiva de CGC en relación a sus ganancias acumuladas.

90. El 11 de febrero de 2013, el Sr. Juan Antonio Larrea envió una carta a Gómez en la que expresó que:

> ...[J]amás ha sido ni es la intención de los accionistas de la corporación ... el evadir nuestras obligaciones contributivas personales como para justificar unas penalidades contributivas extraordinarias y menos aún, usar la corporación para fines ilegales. Todo lo contrario, las razones que nos han motivado siempre sobre el tema de los dividendos- razones que hemos explicado a la saciedad tanto en las reuniones de directores como por escrito, siendo nuestra comunicación más reciente la del 14 de noviembre de 2012 y que han causado un impasse entre los cuatro directores en la Junta- son legítimas, serias, y de peso, y persiguen proteger los mejores intereses de la corporación. Como hemos explicado anteriormente, creemos en el uso prudente del capital corporativo en la expansión de las operaciones y evitar distribuciones prematuras de dividendos. También hay

que tomar en consideración que distribuir dividendos sin incluir a personas que todos hemos acordado y reconocido como accionistas minoritarios desde el principio, expondría a la corporación a responsabilidad frente a esos terceros.

*Exhibit G.*

91.  El 13 de febrero de 2013, el Sr. Juan Antonio Larrea envió una carta a los accionistas minoritarios de GOI explicando el impasse en la Junta de Directores sobre la distribución de dividendos y la existencia de accionistas minoritarios. *Exhibit H.*

92.  Aniceto Solares, Fernando Toro, Felipe Flores, Ivelisse Cordoves, Arturo Fernández, María Larrea, Gerardo Larrea Jr., Luis Arenas, Lcdo. Jacobo Ortíz, Alex Cerda y Lcdo. Gilberto Marxuach contestaron la carta de 13 de febrero y expresaron su sorpresa e indignación por la posición asumida por los demandantes. Además, confirmaron su participación en GOI/CGC y solicitaron el cumplimiento del compromiso asumido por dicha corporación. Estas cartas fueron notificadas a Cook y Gómez el 18 de septiembre de 2013. *Exhibit I.*

93.  El 25 de febrero de 2013, el bufete López, Sánchez, Pirillo & Hymovitz ("López"), a petición de los comparecientes, presentó su opinión sobre las ganancias acumuladas de CGC y determinó que: "the tax imposed by Section 1022.05 does not apply to CGC for taxable years ending through May 31, 2012, and projected for May 2013."

94.  De igual forma, la firma BDO Puerto Rico, PSC ("BDO") determinó que: "the Company has not accumulated earnings and profits in excess of its reasonable business needs and, therefore, we believe that an accumulated earnings tax should not be assessed by the Treasury for taxable years ended on May 2011, 2012 and projected 2013."

95.  El 27 de febrero de 2013, el Sr. Juan Antonio Larrea envío copia de ambas opiniones a Cook y Gómez. *Exhbit J.*

32

96.  El 6 de marzo de 2013, Kevane rectificó su opinión previa y expresó que al momento de preparar la opinión del 1 de febrero "desconocía de la existencia de las desavenencias entre los accionistas de la corporación…". Además, indicó que no estaban ofreciendo "recomendación alguna con respecto a la necesidad y/o deseabilidad de declarar dividendos, a la cantidad de ganancias que debe y/o puede retenerse ni la cantidad que puede ser utilizada para el pago de dividendos, ni una opinión con respecto a ninguno de estos extremos". *Exhibit K*.

97.  El 16 de abril de 2013, Gómez envió una carta al Sr. Juan Antonio Larrea en la que expresó su desacuerdo con las opiniones de López y BDO e insistió en la declaratoria de dividendos. Anejó una segunda opinión legal de PMA sobre el tema. En cuanto a los accionistas minoritarios expresó que "ni CGC o GOI tienen obligación legal alguna" de emitir acciones sin voto.

98.  En la segunda opinión, PMA expresó que se podía establecer una cuenta "escrow" con los dividendos que podían corresponderle a los accionistas minoritarios en lo que se dilucidaba la participación de estos accionistas en la corporación.

99.  Las opiniones de Kevane y PMA no contradicen ni refutan las opiniones de BDO y López. En efecto, PMA coincide con dichas opiniones en que el análisis correcto es uno de "Net Liquid Assets" y no de "Accumulated Earnings and Profits".

100. El 8 de mayo de 2013, el Sr. Juan Antonio Larrea envió una carta a Cook y Gómez en la que expresó que:

> Como te hemos indicado anteriormente, estamos de
> acuerdo con el concepto del pago de dividendos, y
> es algo que deseamos que suceda en CGC. Continuamos
> preocupados, sin embargo, con el patrón de ventas
> negativas, que ya va por el cuarto año consecutivo
> (sin contar con el efecto canibalizador que
> indudablemente tendrán las aperturas de las tiendas
> 6 y 7). La postura conservadora sería proteger el
> capital de CGC y esperar a que abran dichas tiendas

33

y las ventas se estabilicen, antes de comenzar a
pagar dividendos.

No obstante lo anterior y en vista de la
recomendación de PMA para salvaguardar los derechos
de los Accionistas Minoritarios de poner en plica
su 16% de participación en los dividendos, no
tenemos reparo en que se declare un dividendo de
$1,000,000 para así poner el supuesto "riesgo
contributivo" que corre CGC y poder enfocarnos en
asuntos más productivos[.]

101. La carta concluye con una solicitud de establecer los
mecanismos necesarios para la cuenta "escrow". Además, se
anejaron resoluciones conjuntas de las Juntas de Directores y
Accionistas de CGC y GOI, firmadas por los comparecientes,
aprobando el referido dividendo. *Exhibit L.*

102. El 21 de mayo de 2013, Gómez envió una carta al Sr.
Juan Antonio Larrea en la que aceptó la declaración de $1 millón
en dividendos, pero rechazó el establecimiento de una cuenta
"escrow" y recomendó la declaración de $5.3 millones en
dividendos. *Exhibit M.*

103. El 26 de agosto de 2013, el Sr. Juan Antonio Larrea
envió una carta a Gómez reiterando su posición sobre los asuntos
en controversia, y la disposición de declarar dividendos y
establecer una cuenta "escrow". *Exhibit N.*

104. El 17 de septiembre de 2013, el Sr. Juan Antonio
Larrea envió una carta a los accionistas minoritarios
informando los últimos acontecimientos relacionados a su
participación en la compañía.

105. El año fiscal de CGC finalizó el 26 de mayo de 2013.
Kevane realizó la auditoría y emitió una opinión favorable sobre
los estados financieros de CGC. En su opinión, Kevane no hizo
señalamiento alguno con respecto a las alegadas ganancias
retenidas en exceso ni el alegado riesgo de multas por el
Departamento de Hacienda. *Exhibit O.*

106. Durante noviembre de 2013, Cook realizó acusaciones
infundadas sobre el uso de propiedad intelectual y las marcas

del franquiciador de Krispy Kreme provocando que CGC violara el contrato de franquicia.

107. Los demandantes han presentado en el récord público, junto con la "Petición de Mandamus", información altamente confidencial, sensitiva y privilegiada de CGC la cual podría exponer a la corporación a multas e investigaciones contributivas, injustificadamente.

III. **CAUSAS DE ACCIÓN**

A. **Primera Causa de Acción: Sentencia Declaratoria Determinando que los Comparecientes Cumplieron con su Deber de Fiducia.**

108. Se incorporan a esta sección las defensas levantadas en la Contestación a la "Petición de Mandamus", y los párrafos 1-107 que anteceden.

109. Cook y Gómez insisten en declarar y pagar dividendos excluyendo a un grupo de individuos que desde el 2003 fueron considerados accionistas minoritarios de la corporación.

110. Cook y Gómez rechazan la existencia de estos accionistas, a pesar de que la corporación se obligó a venderles las acciones correspondientes.

111. El Sr. Gerardo Larrea y el Sr. Juan Antonio Larrea, aunque comparten el interés y el deseo de que se declaren y paguen dividendos, entienden que es mejor aplazar la distribución ya que, entre otras razones, no se ha cumplido con el compromiso realizado a los accionistas minoritarios de hacerlos partícipes del 16% de las acciones.

112. En un intento de salvaguardar los derechos de los accionistas minoritarios y poner a un lado el alegado "riesgo contributivo" que, según los demandantes, corre CGC por no declarar dividendos, los comparecientes accedieron a declarar un dividendo de $1 millón y separar un 16% ($160,000) en una cuenta "escrow" hasta que se dilucidara la controversia sobre la participación de los accionistas minoritarios.

113. Cook y Gómez no accedieron al establecimiento de la cuenta "escrow".

114. El Artículo 2.03 de la Ley General de Corporaciones de 2009 ("LGC") establece el marco dentro del cual los oficiales y directores deben ejercer sus facultades administrativas:

> La autoridad y los poderes conferidos a toda corporación … o a los directores y oficiales de la misma … se disfrutarán y deberán ejercerse por la corporación o por los directores u oficiales, según sea el caso, **en beneficio de los accionistas de la corporación y para la gestión prudente de sus negocios y asuntos, así como para la promoción de sus objetivos y propósitos.**

(Énfasis nuestro).

115. Del texto de este artículo se desprenden las obligaciones principales de los directores y oficiales de la corporación: (1) actuar de manera *intra-vires* o conforme a los objetivos y propósitos de la corporación; (2) desempeñar sus funciones de forma prudente o diligente; y (3) **ejercer sus facultades con lealtad o en beneficio de la corporación y sus accionistas.** C. Díaz Olivo, *Corporaciones*, Publicaciones Puertorriqueñas, Inc., Hato Rey, pág. 102 (1999).

116. El Artículo 4.03 de la LGC establece que:

> Los directores y oficiales estarán obligados a dedicar a los asuntos de la corporación y al desempeño de sus funciones, la **atención y el cuidado que en una posición similar y ante circunstancias análogas desempeñaría un director u oficial responsable y competente al ejercer de buena fe su juicio comercial.** Sólo la negligencia crasa en el desempeño de las obligaciones y deberes antes reseñados conllevará responsabilidad.

(Énfasis nuestro).

117. Bajo este artículo, el análisis de la imposición de responsabilidad queda enmarcado dentro del contexto comercial corporativo. Díaz Olivo, pág. 125. Es decir, el desempeño del funcionario corporativo se debe evaluar con relación a la atención y el cuidado que prestaría un director u oficial

responsable y competente en una posición similar y ante circunstancias análogas. *Id.*, pág. 127.

118. La tendencia moderna de los tribunales es exigir de los administradores el grado de diligencia que ante circunstancias similares y en una posición similar ejercería una persona de prudencia ordinaria. *Id.*

119. Ante la obligación asumida por CGC y sus accionistas principales de reconocer la participación de los accionistas minoritarios, además del marco económico en el que se encuentra la compañía, los comparecientes ejercieron el grado de diligencia que una persona ordinaria hubiera ejercido, y su buen juicio comercial, y aplazaron la declaración y pago de dividendos hasta que se determinara finalmente la existencia de los accionistas minoritarios y mejorara la recesión económica en Puerto Rico, entre otros de los argumentos mencionados en el correo electrónico de 14 de noviembre de 2012.

120. Un dividendo sin la protección a los accionistas minoritarios sería ilegal; en detrimento de los derechos de los accionistas minoritarios; y expondría a la corporación a responsabilidades y posibles reclamaciones judiciales, además de comprometer el capital corporativo de CGC para la expansión de las operaciones y el cumplimiento de las obligaciones asumidas con el franquiciador.

121. Los comparecientes han actuado en beneficio de la corporación y sus accionistas, y en protección de los intereses y la gestión prudente de los negocios de CGC.

122. Procede que este Hon. Tribunal declare que los comparecientes han actuado conforme a sus obligaciones bajo el deber de fiducia.

B.    **Segunda Causa de Acción: Acción Derivativa**

123. Se incorporan a esta sección las defensas levantadas en la Contestación a la "Petición de Mandamus", y los párrafos 1-122 que anteceden.

124. El Art. 12.06 de la LGC dispone que:

En cualquier pleito entablado por un accionista a beneficio de alguna corporación organizada con arreglo a las leyes del Estado Libre Asociado, deberá alegarse en la demanda que el demandante era accionista de la corporación cuando se efectuó la transacción impugnada, o que las acciones le fueron transferidas luego de la transacción por ministerio de ley.

125. La acción derivativa "es un remedio en equidad reconocido por los tribunales para vindicar los derechos de la corporación, cuando las personas llamadas a hacerlo no lo hacen". Díaz Olivo, pág. 278.

126. Para presentar una acción derivativa, los tribunales exigen el cumplimiento estricto de los siguientes requisitos: (1) la corporación debe incluirse como parte demandada; (2) la persona que insta la acción debe haber sido accionista al momento en que ocurrió el daño que reclama, y durante todo el procedimiento; (3) antes de acudir al tribunal, el accionista debe reclamar a los administradores de la corporación que tomen acción sobre el particular; (4) por tratarse de una acción en equidad, el accionista está sujeto a las defensas tradicionales de equidad, como manos limpias, impedimento, incuria y renuncia, entre otras; y (5) el pleito no debe transigirse ni desistirse sin la autorización del tribunal. *Id.*, págs. 278-279.

127. El Sr. Gerardo Larrea y el Sr. Juan Antonio Larrea han sido accionistas de la corporación desde sus inicios y hasta el presente.

128. Desde el 2003, CGC y sus accionistas principales comenzaron a discutir la composición e identidad de los accionistas de GOI, incluyendo la participación de un grupo de accionistas minoritarios.

129. En el 2008 se determinó la lista final de accionistas, incluyendo la participación de un grupo de accionistas minoritarios.

130. Desde el 2008-2009, los comparecientes solicitaron a la Junta de Directores la integración de los accionistas minoritarios a la corporación.

131. El 14 de noviembre de 2012, los comparecientes solicitaron nuevamente la integración de los accionistas minoritarios, y que se determinara la contribución de capital de cada uno de estos accionistas. Esta petición fue reiterada el 11 de febrero de 2013.

132. Cook y Gómez se niegan a reconocer la participación de estos accionistas minoritarios, a pesar de haber participado en la discusión y determinación final de accionistas.

133. Cook y Gómez, en menosprecio de los mejores intereses de la corporación, insisten en declarar unos dividendos ilegales en detrimento de los derechos de los accionistas minoritarios; que exponen a la corporación a responsabilidad y posibles reclamaciones judiciales; y comprometen el capital corporativo de CGC para la expansión de las operaciones y en cumplimiento de los acuerdos con el franquiciador.

134. Los demandantes se han autoimpuesto un papel protagónico en las operaciones diarias de CGC y han dejado fuera ("lock out") a los comparecientes, accionistas y directores de la corporación, de la toma de decisiones importantes del negocio.

135. Los demandantes, directores y accionistas de la corporación, violan su deber de fiducia al promover intereses personales sobre los beneficios y mejores intereses de la corporación.

136. Cook y Gómez, actuando con negligencia crasa y en un claro conflicto de interés, se oponen a la participación de los accionistas minoritarios para excluirlos del pago de los dividendos y así recibir un porcentaje mayor del que les correspondería.

137. Cook y Gómez exigen que se declaren dividendos para alegadamente proteger a la corporación de riesgos contributivos. Sin embargo, los comparecientes, aceptando una sugerencia del bufete PMA, accedieron a declarar $1 millón en dividendos para poner a un lado las reclamaciones infundadas de los demandantes y poder continuar con la administración de la corporación. La única condición de los comparecientes fue que se estableciera una cuenta "escrow" que protegiera la participación de los accionistas minoritarios.

138. Cook y Gómez se negaron al establecimiento de una cuenta "escrow", a pesar de que esta solución fue sugerida por el bufete de la corporación y hubiera disminuido el alegado riesgo.

139. En vista de que la Junta de Directores se encuentra en un impasse que impide que pueda defenderse en contra de la declaratoria y pago de un dividendo ilegal, los comparecientes solicitan que este Hon. Tribunal prohíba la declaración y pago de dividendos hasta que se determine la composición de los accionistas de la corporación.

140. Además, se solicita que el Tribunal declare que cualquier acto de los demandantes realizado sin la aprobación previa de la Junta de Directores, incluso la contratación de abogados, sea declarado nulo y *ultra vires*.

C. **Tercera Causa de Acción: Contabilidad**

141. Se incorporan a esta sección las defensas levantadas en la Contestación a la "Petición de Mandamus"; y los párrafos 1-140 que anteceden.

142. La lista final de accionistas incluye a: Cook, Gómez, el Sr. Gerardo Larrea, el Sr. Juan Antonio Larrea, Luis Arenas, Lcdo. Jacobo Ortíz, Gerardo Larrea Jr., Arturo Fernández, Felipe Flores, Ivelisse Córdovés, Lcdo. Gilberto Marxuach, Fernando Toro, Alex Cerda, María Larrea, y Aniceto Solares.

143. El Sr. Juan Antonio Larrea, el Sr. Gerardo Larrea, Cook y Gómez, poseen el 21% de interés propietario, para un total de 84% de las acciones.

144. El resto de los accionistas poseen en promedio un 1.5% de interés propietario, para un total del 16% de las acciones.

145. El Sr. Gerardo Larrea, el Sr. Juan Antonio Larrea, Cook y Gómez contribuyeron $87,500.00 cada uno a la corporación.

146. Los accionistas minoritarios han pagado total o parcialmente por las acciones con su trabajo y servicios a favor de la corporación, según dispone el Artículo 5.02 de la Ley General de Corporaciones.

147. El trabajo y servicios ofrecidos por los accionistas minoritarios es un método intangible de pago del cual no existe una suma determinada. Por lo tanto, resulta complicado contabilizar la cantidad de capital que ha aportado cada accionista y si tienen que hacer algún tipo de pago adicional para adquirir las acciones de la corporación.

148. La Ley General de Corporaciones de 2009 y el Código Civil de Puerto Rico no proveen un remedio para contabilizar y valorar el trabajo realizado y los servicios ofrecidos por los accionistas minoritarios en beneficio de la corporación.

149. Los comparecientes, directores y accionistas de la corporación, tienen una relación de fiducia con los demandantes y los accionistas minoritarios.

150. Luego de que transcurran todos los trámites de ley y se decrete la composición final de los accionistas, incluyendo

la participación de los accionistas minoritarios, procede que
este Hon. Tribunal le ordene a la Junta de Directores que:

     (i)    contabilice y asigne un valor al trabajo y
              servicio brindado por ciertos accionistas
              minoritarios en beneficio de la corporación; y/o

    (ii)   valide la cantidad pactada y determine la deuda
              de cada accionista minoritario para el pago total
              de sus acciones.

    **D.**   **Cuarta Causa de Acción: Inspección de Documentos
       Corporativos.**

151. Se incorporan a esta sección las defensas levantadas
en la Contestación a la "Petición de Mandamus", y los párrafos
1-150 que anteceden.

152. Los comparecientes son accionistas de la corporación
desde sus inicios.

153. En diciembre de 2010, el Sr. Juan Antonio Larrea
solicitó acceso a las cuentas bancarias de CGC. No obtuvo el
acceso solicitado.

154. En noviembre de 2011, los comparecientes reiteraron la
petición de diciembre de 2010. No obtuvieron el acceso
solicitado.

155. En abril y mayo de 2012, y el 16 de enero de 2013, los
comparecientes reiteraron la solicitud de obtener acceso a las
cuentas bancarias corporativas. Gómez expresamente rechazó el
acceso a las cuentas.

156. Los demandantes se retrasan en preparar y circular los
estados financieros de la corporación, a pesar de las múltiples
solicitudes de los comparecientes.

157. Los demandantes excluyen a los comparecientes de las
operaciones y toma de decisiones de Krispy Kreme, aún siendo
accionistas de CGC y dicho negocio haber recibido el apoyo del
Grupo Larrea.

158. Los demandantes transfirieron la nómina ejecutiva (que incluye el control absoluto del pago de sus propios salarios y bonos) sin el aval de la mayoría de los directores.

159. Los demandantes debitaron $5,000,010.00 de la cuenta de Oriental Bank utilizando un cheque de Gerente, sin el aval de la mayoría de los directores.

160. Cook y Gómez se autorizan y pagan bonos sin el aval ni el consentimiento de la Junta.

161. Gómez, empleada de Cook, aprueba los gastos de Cook de su "expense account".

162. Los demandantes, además, recomendaron en la carta de 21 de mayo de 2013 la declaratoria de $5.3 millones en dividendos, utilizando un cálculo incorrecto.

163. El Artículo 7.10(B) de la LGC establece que:

Cualquier accionista, por sí o por apoderado u otro agente, mediante requerimiento jurado en donde consigne su propósito, tendrá el derecho de examinar, así como de hacer copias o extractos, para cualquier propósito válido durante las horas regulares de oficina:

(1)   el registro de las acciones, la relación de accionistas y los demás libros de la corporación; y
(2)   los libros de la subsidiaria[.]

164. Los comparecientes solicitan examinar todos los libros de CGC y GOI que sean necesarios para indagar sobre su situación fiscal, las cuentas bancarias, la nómina ejecutiva y los estados financieros.

165. En específico, se solicita examinar los siguientes documentos:

a.   Estados financieros no auditados del periodo 2, 3, 4 y 5 del año fiscal 2014.
b.   "Trial Balances" desde el 2010 hasta el presente.
c.   Mayor General ("General Ledger") desde el 2010 hasta el presente.
d.   Estados bancarios mensuales de las cuentas de efectivo y cheques, incluyendo copia de los cheques cancelados que evidencien la actividad en las cuentas desde el 2010 hasta el presente.
e.   Planillas de Contribución sobre Ingresos para los años contributivos 2010, 2011 y 2012.

43

f.   Los siguientes documentos radicados ante el
     Departamento de Hacienda para los años
     contributivos 2010, 2011 y 2012:

   i.   Estado de Reconciliación Anual de Ingresos
        Sujetos a Retención (Formulario 499 R-1B);
  ii.   Planilla Trimestral Patronal de Contribución
        sobre Ingresos Retenida (Formulario 499 R-
        1B);
 iii.   Estado de Reconciliación de Contribución
        sobre Ingresos Retenida (Formulario 499 R-
        3); y
  iv.   Comprobantes de Retención (Formularios 499R-
        2/W-2PR).

g.   Detalle de cuentas por cobrar desde el 2010 hasta
     el presente.
h.   Valoración de los inmuebles hasta el presente.
i.   Detalle de todos los intereses de los oficiales
     en CGC y GOI, incluyendo todos los accionistas,
     desde el 2010 hasta el presente.
j.   Detalle de las transacciones relacionadas a
     gastos no recurrentes incluidos como parte de los
     gastos operacionales desde el 2010 hasta el
     presente.
k.   Evidencia de los cómputos realizados para
     determinar cualquier bonificación que se haya
     pagado durante el 2010 hasta el presente.
l.   Evidencia de todos los beneficios pagados a, o
     disfrutados por, John Cook y Ellysmar Gómez con
     cargo a la corporación ya sea en calidad de
     salario, bonificaciones, pagos de cuentas de
     deudas u otros conceptos.
m.   Comunicaciones entre CGC y GOI, y sus oficiales,
     directores, accionistas, abogados y el Bufete
     Pietrantoni Méndez & Álvarez LLC y vice versa.
n.   Detalle de gastos legales desde el 2010.
o.   Comunicaciones entre CGC y GOI, y sus oficiales,
     directores, accionistas, abogados y Kevane Grant
     Thornton LLP y vice versa.

166. Procede que este Hon. Tribunal ordene la inspección de

los documentos solicitados.

**E.   Quinta Causa de Acción: Administrador Judicial**

167. Se incorporan a esta sección las defensas levantadas

en la Contestación a la "Petición de Mandamus", y los párrafos

1-166 que anteceden.

168. Los demandantes-reconvenidos Cook y Gómez poseen el

42% de interés propietario de las acciones de GOI.

169. Los demandados-reconvinientes, el Sr. Gerardo Larrea y

el Sr. Juan Antonio Larrea, poseen el 42% de interés propietario

de las acciones de GOI.

44

170. La Junta de Directores de GOI y CGC está compuesta por Cook, Gómez, el Sr. Gerardo Larrea y el Sr. Juan Antonio Larrea, como Presidente.

171. Al presente, existe un impasse o tranque entre los directores, que son también los accionistas, ya que no se pueden poner de acuerdo, entre otras cosas, en la composición de los accionistas de la corporación; la declaratoria y pago de dividendos; el alegado riesgo contributivo de la corporación por no pagar dividendos; el acceso a la información financiera de las corporaciones; participación de los comparecientes en la Junta y en las operaciones del negocio; y los documentos corporativos.

172. Además, Cook y Gómez se autorizan y pagan bonos sin el aval ni el consentimiento de la Junta.

173. El Artículo 7.16(a)(2) de la LGC dispone que:

(a) A petición de cualquier accionista, el Tribunal de Primera Instancia (Sala Superior) podrá nombrar a una (1) o más personas como administrador o administradores judiciales y, si la corporación está insolvente, como síndico o síndicos, de cualquier corporación, cuando:

....

2. Los asuntos de la corporación estén sufriendo daños irreparables o estén bajo amenaza de sufrir los mismos debido al empate entre los directores en cuanto a la administración de los asuntos de la corporación de que no se pudiera obtener la votación necesaria para actuar de parte de la junta de directores y los accionistas no pueden poner fin al empate[.]

174. El impasse entre los directores sobre la composición de los accionistas impide la declaratoria y pago de los dividendos, y provoca que Cook y Gómez se escuden en argumentos sobre alegadas violaciones contributivas en un intento de forzar el pago de dividendos.

175. La corporación está bajo la amenaza de sufrir un daño irreparable debido a las posibles reclamaciones judiciales de los accionistas minoritarios.

176. Además, Cook y Gómez exponen a la compañía a investigaciones y auditorías del Departamento de Hacienda por insistir en el alegado riesgo contributivo de la corporación.

177. Por sí fuera poco, las corporaciones se encuentran sin representación legal para defenderse del presente caso ya que el impasse en la Junta y los accionistas impide que se les nombre un abogado.

178. La Junta de Directores, al estar constituida por sólo cuatro directores, llegaría inevitablemente a un impasse si alguna de las partes convocara una reunión para votar sobre la contratación de abogados.

179. Ante esta situación, procede que este Hon. Tribunal designe un administrador judicial imparcial y de probado trasfondo en negocios, cuyas decisiones y actuaciones vinculen a los oficiales y directores de la corporación.

180. El administrador debe tener el poder de nombrar un representante legal para las corporaciones, intervenir en decisiones de la junta de directores para resolver cualquier tranque, y llamar a reuniones de la junta de directores y de accionistas. Véase Miller v. Miller, 2009 WL 554920 (Del. Ch. 2009).

POR TODO LO CUAL, el Sr. Gerardo Larrea y el Sr. Juan Antonio Larrea solicitan que este Hon. Tribunal deniegue la solicitud de *mandamus* de los demandantes y declare con lugar la Reconvención. RESPETUOSAMENTE SOMETIDA.

En San Juan, Puerto Rico, a 2 de diciembre de 2013.

CERTIFICO que en el día de hoy se envió copia fiel y exacta de este escrito por correo regular al Lic. Rubén Niglagioni Mignucci y a la Lic. Mónica Vega Quintana, Niglagioni Law Offices, P.S.C., P.O. Box 9023865, San Juan, P.R. 00902-3865; y por correo electrónico a rtn@niglagionilaw.com y mvq@niglagionilaw.com.

**CASELLAS ALCOVER & BURGOS, P.S.C.**
P.O. Box 364924
San Juan, Puerto Rico 00936-4924
Tel. (787) 756-1400
Fax. (787) 756-1401


Ricardo F. Casellas
R.U.A. Núm. 8466
rcasellas@cabprlaw.com


Heriberto Burgos Pérez
R.U.A. Núm. 8746
hburgos@cabprlaw.com


Natalia Morales Echeverría
R.U.A. Núm. 16824
nmorales@cabprlaw.com

ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE PRIMERA INSTANCIA
SALA SUPERIOR DE SAN JUAN

JOHN MATTHEW COOK Y ELLYSMAR
GOMEZ LUZARDO

    Demandantes

        v.

CARIBBEAN GLAZE CORPORATION;
GLAZE ON INVESTMENTS, INC.;
F. GERARDO LARREA OLOZAGA;
JUAN ANTONIO LARREA FRENCH

    Demandados

CIVIL NÚM: K PE2013-5152 (904)

## MOCIÓN SOMETIENDO DOCUMENTOS BAJO SELLO

Comparecen los codemandados, el Sr. Gerardo Larrea y el Sr. Juan Antonio Larrea (los "Sres. Larrea"), por conducto de sus abogados que suscriben y muy respetuosamente exponen y solicitan:

1.   El 2 de diciembre de 2013, los Sres. Larrea presentaron ante este Tribunal una "Contestación a 'Petición de Mandamus' o Demanda y Reconvención".

2.   Los exhibits del referido escrito contienen información interna sobre las operaciones de las compañías involucradas en la presente controversia, y otros documentos de carácter confidencial.

3.   Por lo que, para proteger la confidencialidad de los documentos, se presentan bajo sello todos los exhibits (Exhibits A-Q) de la "Contestación a 'Petición de Mandamus' o Demanda y Reconvención".

RESPETUOSAMENTE SOMETIDA.

En San Juan, Puerto Rico, hoy 2 de diciembre de 2013.

CERTIFICO que en el día de hoy se envió copia fiel y exacta de este escrito por correo regular al Lic. Rubén Niglagioni Mignucci y a la Lic. Mónica Vega Quintana, Niglagioni Law

Offices, P.S.C., P.O. Box 9023865, San Juan, P.R. 00902-3865; y

por correo electrónico a <u>rtn@niglagionilaw.com</u> y

<u>mvq@niglagionilaw.com</u>.

**CASELLAS ALCOVER & BURGOS, P.S.C.**
P.O. Box 364924
San Juan, Puerto Rico 00936-4924
Tel. (787) 756-1400
Fax. (787) 756-1401


Natalia Morales Echeverría
R.U.A. Núm. 16824
nmorales@cabprlaw.com

2

## 2008 Shareholder's List
### Caribbean Glaze Corporation

| | Equity Participation | Estimated Equity Contribution in Yr. 1 (US$) | Estimated Equity Contribution in Yrs. 2-5 (US$) | Total Projected Equity Contribution for 5 Yrs. (US$) |
|---|---|---|---|---|
| Arenas, Luis | 2.00% | 12,619 | 32,892 | 45,511 |
| Carda, Alex | 1.00% | 6,310 | 16,446 | 22,756 |
| Cook, John | 21.00% | 132,500 | 345,369 | 477,869 |
| Cordovez, Ivelisse | 1.00% | 6,310 | 16,446 | 22,756 |
| Fernandez, Arturo | 2.00% | 12,619 | 32,892 | 45,511 |
| Flores, Felipe | 1.00% | 6,310 | 16,446 | 22,756 |
| Gomez, Elliyemar | 21.00% | 132,500 | 345,369 | 477,869 |
| Larrea French, Gerardo | 1.00% | 6,310 | 16,446 | 22,756 |
| Larrea Olzaraga, Gerardo | 20.00% | 126,190 | 328,923 | 455,113 |
| Larrea, Juan Antonio | 21.00% | 132,500 | 345,369 | 477,869 |
| Larrea, Maria | 1.00% | 6,310 | 16,446 | 22,756 |
| Marxuach, Gilberto | 2.00% | 12,619 | 32,892 | 45,511 |
| Ortiz, Jacobo | 2.00% | 12,619 | 32,892 | 45,511 |
| Solares, Aniceto | 2.00% | 12,619 | 32,892 | 45,511 |
| Toro, Fernando | 2.00% | 12,619 | 32,892 | 45,511 |
| **Total Equity Contribution** | **100.00%** | **630,862** | **1,644,614** | **2,275,668** |

| | | Year 1 | Years 2-5 | Total |
|---|---|---|---|---|
| **Total Estimated Investment*** | | 3,050,000 | 7,950,000 | 11,000,000 |
| Equity | 20.69% | 530,852 | 1,664,614 | 2,275,566 |
| Bank Debt | 79.31% | 2,419,048 | 6,305,385 | 8,724,434 |

* Total investment for the first five years of the company is based on the Business Plan prepared in October of 2008. The Business Plan assumes that the company will open a total of seven factory stores in a period of five years and contemplates an actual estimated required investment and working capital need of $11.00M.